IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
UNITED STATES OF AMERICA     *  Case No. 1:20CR512-1
                             *
vs.                          *  Greensboro, North Carolina
                             *  February 3, 2022
BRADLEY CARL REIFLER,        *  2 p.m.
                             *
            Defendant.       *
*******************************
```

**EXPEDITED TRANSCRIPT FINAL PRETRIAL CONFERENCE/MOTION HEARING**
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        THOMAS J. TYNAN, ESQUIRE
                           MICHAEL P. MCCARTHY, ESQUIRE
                           Department of Justice
                           1400 New York Avenue, NW
                           Washington, DC 20530

For the Defendant:         MARK A. JONES, ESQUIRE
                           Bell Davis & Pitt, P.A.
                           Post Office Box 21029
                           Winston-Salem, North Carolina 27120

                           ROBERT S. SILVERBLATT, ESQUIRE
                           STEPHEN G. TOPETZES, ESQUIRE
                           K&L GATES LLP
                           1601 K Street, NW
                           Washington, DC 20006

Also Present:              Graham T. Green, AUSA

Court Reporter:            Lori Russell, RMR, CRR
                           P.O. Box 20593
                           Winston-Salem, North Carolina 27120

Proceedings recorded by stenotype reporter.
Transcript produced by Computer-Aided Transcription.

1              **P R O C E E D I N G S**

2        (Defendant present.)

3             **THE COURT:**  Good afternoon.

4        (Simultaneous response from counsel.)

5             **THE COURT:**  All right.  So let's see.  Here for the --

6    this is United States against -- it's Reifler, correct?

7             **MR. JONES:**  Yes, Your Honor.

8             **THE COURT:**  Bradley Carl Reifler, 20CR512, here for

9    the final pretrial conference.

10       Just to be sure I know who everybody is, here for the

11   Government?

12            **MR. TYNAN:**  Good afternoon, Your Honor.  Tom Tynan and

13   Michael McCarthy on behalf of the United States.

14            **THE COURT:**  All right.  I'm just going to warn y'all

15   if you change seats at any time during proceedings, I'm likely

16   to get you mixed up today.  I will try to -- like -- these

17   masks.  But I'll try to keep you straight.

18       All right.  At the other table, Mr. Jones.

19            **MR. JONES:**  Yes, Your Honor.  Mr. Silverblatt is with

20   me from K&L Gates, as is Stephen Topetzes, and at the far end

21   of the table is Mr. Reifler.

22            **THE COURT:**  All right.  And it's Mr. Silverblatt

23   here --

24            **MR. SILVERBLATT:**  Yes, Your Honor.

25            **THE COURT:**  -- and Mr. Topetzes?

1          **MR. TOPETZES:**  Yes, Your Honor.

2          **THE COURT:**  All right.  Thank you.

3     And we'll –– y'all are the ones who are going to be trying

4 the case?

5          **MR. TYNAN:**  Yes, Your Honor.

6          **THE COURT:**  All of y'all will be sitting here?  Is

7 that –– I'm asking who do I need to introduce to the jury?

8          **MR. JONES:**  I will certainly be here every day.

9 Mr. Silverblatt will not be here every day.  He'll be some of

10 the days.  Mr. Topetzes will not be here for all of the days.

11          **THE COURT:**  All right.  That's fine.  The only person

12 who can argue the case to the jury has to be here for the

13 entire trial.  I don't let people argue the case who haven't

14 been present in the courtroom for the entire trial.

15          **MR. JONES:**  Understood, Your Honor.

16          **THE COURT:**  As long as that's you, that's fine.

17          **MR. JONES:**  Yes, Your Honor.

18          **THE COURT:**  Okay.  The time I had the most trouble

19 with that was a patent case where the lawyers didn't –– didn't

20 seem to think they needed to be here all the time, but we got

21 that straight.

22     So I have a long list, and I think that everything –– the

23 only thing left to be filed are the exhibit and witness lists

24 that I've asked y'all to file on February 7th.

25     Everything else has been filed, correct?

1          **MR. TYNAN:**  Yes, Your Honor.

2          **THE COURT:**  Is that right, Mr. Jones?

3          **MR. JONES:**  Yes, Your Honor.

4          **THE COURT:**  I've read the trial briefs.  We've got a

5     couple of motions in limine, a motion to dismiss.

6          So first I want to talk about the pandemic so that it is

7     not the elephant in the room.  You know, we've tried cases here

8     during the pandemic.  We tried -- I tried cases here before

9     vaccines, as did one of my colleagues.  I think it was

10    Judge Osteen.  And then since vaccines we've tried several.

11         This Omicron variant is a little different from what we've

12    experienced before because it's so contagious and because the

13    vaccine does not appear to be quite as good.  And, of course,

14    you know, if you're not vaccinated, it's particularly

15    difficult, contagious, and such.  On the other hand, it appears

16    to not be making most people as sick, but, you know, that's

17    just most people.

18         So I looked -- North Carolina has got a good dashboard.

19    We've been following it along, and the daily numbers are

20    definitely going down in the state as a whole.  It was hard for

21    me just to pull out the Middle District, but, you know, there's

22    still quite a lot, more than before this surge began in --

23    when? -- late November that we started seeing it.  The positive

24    test percentage is down significantly.  That's really good.

25    But it's still very high.  It's, like, over 20 percent.

1        And there's several counties in this district that are a
2    good bit higher.  There are also some that are a good bit
3    lower.  They are probably the ones you would guess.  So -- and
4    then the hospitalization numbers are down a little bit.  The
5    peak was actually in December.  So I don't know -- late
6    December for that.
7        I don't know exactly what's -- what's going to happen in
8    the next 10 days, but that's the situation.  And, you know, I'm
9    prepared to go forward.  I just will say I've had a lot of
10   trouble trying cases since this surge hit because people are
11   getting sick; y'all are getting sick; the witnesses are getting
12   sick, and that's the problem that I've had.  It's not with
13   jurors, but -- you know, so -- so if anybody wants to talk
14   about changing the trial date, we can do that if y'all have a
15   plan.
16       I'm prepared to go forward, recognizing that, you know, we
17   just don't control this virus, and if anybody has any reason
18   that we can't try it on the 14th, you need to file your motion
19   as soon as possible.  And I would ask you to just be specific.
20   You know, if somebody actually has a positive test, I would --
21   you know, you need to tell me so.  And you can do it under
22   seal.  I don't -- you know, it's private medical information.
23   That's fine.  I'm not trying to expose anybody's health to the
24   world, but I do need specifics.
25       The setup we'll use in this courtroom, you can see the

1    seats in the jury box.  There's 14 seats there, but we'll have
2    it arranged for eight people in the seats that are numbered 1,
3    2, 3, 4, 5, 6, 7, 8; 9, 10, 11, the three seats in the front.
4    The way -- we've done this different ways in different trials,
5    but I think I'll -- Judge Osteen and I, who use this courtroom
6    for trials, have ended up putting the rest of the jurors back
7    in the gallery area right there, and -- are the chairs there?
8              **MR. RENTERIA:**  Yes, ma'am, two of them are.
9              **THE COURT:**  Two:  12, 13.
10        So we're going to have -- I think we may need to pick more
11   than two alternates, depending on how long this trial is going
12   to take, but -- because of the pandemic.
13        So, you know, we really don't have a lot of choices about
14   where to put jurors, and we really don't have a good courtroom
15   in this building where we can put all the jurors in the
16   gallery, so -- because you can see that's really not a very
17   good idea in here because of the setup.  And in my courtroom,
18   it's so big the jurors at the back, they can't see.
19        So we'll get the -- that's 11, 12, 13.  You know, we'll
20   have to have four or five seats back right there.
21        The jurors will come in and out through -- well, most of
22   them, through that door right there.  The ones who are seated
23   in that corner will come through that door.
24        We will not use the jury room that usually goes with this
25   courtroom.  There's space across the hall the U.S. Attorney

1  makes -- it's usually their space, but they make it available
2  for the jury room during the trial.  And then we have been
3  having them deliberate up in Courtroom 2 in the well of the
4  courtroom where we can set up a big table, and they can all
5  spread around and talk.  The space across the hall is some
6  little rooms -- little, worn rooms.  They can all kind of be
7  together, but they couldn't deliberate in there.

8      So the witness up here.  The courtroom deputy switches out
9  with -- the little cover over the microphone and wipes it down
10 between witnesses.

11     I have been requiring everyone to wear masks during the
12 entire proceedings.  The witness has to take the mask off to
13 testify so the jury can see the face, and in this courtroom,
14 that's really not a problem because the witness is pretty far
15 from everybody.  In my courtroom, the witness is very close to
16 the court reporter and to some of the jurors, but that's not
17 true in here.  So that's really not an issue.

18     And I have been letting the lawyer who is asking questions
19 take -- y'all are all men -- his mask off while questioning the
20 witness.  I think I'm probably willing to still do that here.
21 Now -- you know, there's -- y'all have chosen how many lawyers
22 you want to have here, and there's not really 6 feet between
23 you.  I appreciate that.  So, you know, you can certainly wear
24 your mask as long as I can hear you and -- the witness has got
25 to take the mask off so the jury can see, but if y'all want to

1   leave your mask on while you are questioning, that is fine so
2   long as everybody can hear and understand you.  But I will let
3   you take it off.

4       Because of the pandemic, I'm going to ask everybody to
5   examine witnesses from your tables.

6       For opening and closing, we will put a podium -- I don't
7   know -- somewhere over here so you can -- you've got to be able
8   to see the jurors back there where Mr. Renteria is in the green
9   shirt, raising his hand.  There will be some jurors back there
10  and here, so you'll be kind of over somewhere in between the
11  court reporter and the Government's table, be able to look at
12  them all from a podium.  You can see the screen here for
13  exhibits.

14      Did you take out the monitors in there?

15          **MR. RENTERIA:**  No, Judge, they're in the jury box.
16  There's four of them there.

17          **THE COURT:**  Oh, okay.

18      There are some monitors in the jury box too where they can
19  see exhibits.  The big one will be set up, and there's one
20  there for the well of the courtroom so that the jurors who are
21  back in the gallery will be able to see the exhibits as well.
22  You'll all have monitors on your table.

23      I usually like for people to stand when they examine
24  witnesses.  It's a little less convenient to do that from the
25  table.  So if y'all would rather sit, as long as you don't get

1  too wordy -- sometimes, you know, people are too comfortable
2  sitting, and they just go on and on and on.  You know, as long
3  as y'all don't do that on me, I'm okay with you sitting.
4  That's what we did in state court for many years.  I'm used to
5  that.  So -- so I think, given the document heavy nature of
6  what -- of what I take the evidence will be, that I'm going to
7  let you sit to examine witnesses.

8      You need to have all of your exhibits available
9  electronically so that you do not have to walk up and back to
10  the witness stand all the time.  Now, that said, you know, if
11  you need to walk up there occasionally, that happens, but you
12  need to figure out a way that you don't have to do that.

13      And people have done that different ways.  There's a video
14  monitor there so the witness can see the exhibit.  It's not the
15  same as looking at a piece of paper, and sometimes witnesses
16  just need to look at the piece of paper.  So, you know, you
17  have to be prepared for that.  In some cases people have had
18  notebooks for particular witnesses, you know, so that they have
19  a hard copy in front of them.  That's fine.  You know, you can
20  show them on the monitor and, if you have a problem, take the
21  paper copy up there.

22      But I don't want the -- I don't want you going back and
23  forth.  So, you know, none of this approach the witness 5,000
24  times during the trial.  You need to examine from the table and
25  not move back and forth.  First of all, it takes up too much

1  time, and second of all, during the pandemic, it's just not a
2  good idea.

3      So those generally are the precautions that we will be
4  taking.

5      We will use this room -- this courtroom for jury selection,
6  and when -- y'all will not be able to get in here Monday
7  morning at the -- before the trial starts because the jurors
8  will be coming in here to be checked in and oriented and all
9  that stuff.  And when y'all come in, there will be eight --
10 eight -- there will be eleven in the box, all right, and then
11 the rest of the jury panel will be out there in the courtroom.
12 And I will question these eleven.

13     So I'm going to have a group of jurors here in the morning,
14 and then I'm going to have another group of jurors in the
15 afternoon.  I'm a little concerned we might not be able to get
16 a jury from -- because we can only have so many jurors in here.
17 You know, I can't get 40 people in here, so -- if I could, we
18 could do it all in the morning probably, but we have to do it
19 in two different groups.  So I'll probably have a second group
20 come in, you know, around 12:30 or so, get checked in and be
21 available to us around 1:00.  Maybe I'll have them come in at
22 noon.

23     But my experience is we run out of jurors before we run out
24 of time in the morning, and then we can start back early that
25 afternoon and then maybe even get through the opening

1  statements Monday afternoon.

2      So -- but I doubt very seriously we'll be able to get a

3  witness on the stand on Monday because if I'm going to pick 12

4  jurors plus, you know, at least three alternates, maybe four,

5  that's just going to take -- I'm fast on jury selection, but,

6  you know, the logistics of it and having to do it in two -- two

7  groups is going to take us a while.

8      So y'all will need to be in your conference room spaces on

9  that Monday morning, and then the clerk will call and tell you

10 when we are ready, and she'll tell you, you know, how to -- how

11 to get in the room.  Since Mr. Reifler is not in custody,

12 there's no issues there.  He can just walk in with his

13 attorneys, and there we are.

14     So -- hold on.

15         **MR. JONES:**  Do we know where our conference rooms will

16 be?  On two?

17         **THE COURT:**  I don't know.  Possibly Ms. Winchester

18 knows.

19         **THE COURTROOM DEPUTY:**  Judge, they'll be on the third

20 floor.

21         **THE COURT:**  On the third floor.

22         **MR. JONES:**  Thank you.

23         **THE COURT:**  For the selection, as I say, we'll put

24 eleven in the box.  Y'all get -- how many challenges do you

25 get?  I have it written down.  The Defendant gets 10, and the

1 Government gets 6, right?

2       **MR. JONES:** Yes, Your Honor.

3       **MR. TYNAN:** Yes.

4       **THE COURT:** Yes. Okay.

5    So the way we'll do it, we'll put eleven in. I'll ask them

6 all these questions. When I finish and I -- you know, I've

7 excused whoever I need to for cause and I've replaced them and

8 I have eleven jurors that I'm satisfied with, then I will --

9 we'll do all the bench conferences over here. We'll test it in

10 a little bit. One of you from each side, only one, will step

11 over here, and I'll say to you, "Did I forget to ask them

12 anything important? Do you want me to follow up? Did you want

13 to strike anybody for cause?" You know, anything you want to

14 say.

15    Then you'll go back, and then you'll exercise your

16 peremptories after I've done whatever I finish doing. You'll

17 do that in the way that's common in this district. The clerk

18 will give you a piece of paper; you'll write them down; you'll

19 do it at the same time. You'll give your pieces of paper to

20 the clerk, and the clerk will excuse the jurors who are -- who

21 y'all have excused, and nobody will know whether the Government

22 excused them or the Defendant excused them. And then however

23 many nobody excuses, I'll let those people -- from the morning

24 group anyway, I'll let them probably go and tell them to come

25 back, and -- in any event, I'll let them leave the courtroom.

1    We'll fill more seats, and we'll go until we have –– you

2  know, I would expect the second time around we just fill it up

3  with eleven more people because, you know, there's no reason

4  not to; and then we'll just keep going until we've got enough

5  jurors.

6    Is that reasonably clear?

7         **MR. TYNAN:**  Yes, Your Honor.

8         **THE COURT:**  Yes?

9         **MR. JONES:**  Yes.

10        **THE COURT:**  It's the way I always do it, Mr. Jones.

11        **MR. JONES:**  I was just thinking about how –– the use

12  of peremptories against the lower side of the panel when you

13  already have a certain number selected, but I don't see a

14  problem with that format.

15        **THE COURT:**  Yeah, I mean, it's, you know, always a

16  challenge to know when to hold onto a challenge and when to use

17  it because you don't know who's coming next, but that's always

18  a problem.

19    So that's the logistics of the jury selection.

20    We will have bench conferences, to the extent we need

21  them –– and I hope we will not need very many –– up here.  And

22  because of the pandemic, you know, I just need one of you to

23  come so –– and it would need to be the one who is asking the

24  questions or defending that witness.  So you just need to be

25  prepared for that.

1      Is it all set up, Mr. Renteria?

2           **MR. RENTERIA:**  It is.

3           **THE COURT:**  Can I just -- I kind of feel like *Family*

4   *Feud*.  One of you from each side step up here, and we'll test

5   it out and be sure it works.

6      (The following bench conference occurred while testing the

7   equipment.)

8           **THE COURT:**  All right.  This is the test.

9      Can y'all both hear me?

10          **MR. TYNAN:**  I can hear you loud and clear, Your Honor.

11          **MR. JONES:**  I can also hear you, Judge.

12          **THE COURT:**  And I can hear y'all.

13     Now, let me just turn and look at the court reporter and

14  see if she can hear all of us.

15     Yes.

16     Can the lawyers at the table hear us?

17     They can.  I'm getting a yes.  This is a problem.

18          **MR. RENTERIA:**  Do you want to make the white noise

19  louder, Judge?

20          **MR. JONES:**  I wonder if Mr. McCarthy can hear us.

21          **MR. TYNAN:**  It does not appear that he can.

22          **MR. JONES:**  He seems less likely to be able to hear

23  us.

24          **THE COURT:**  Mr. McCarthy, can you hear us?

25          **MR. JONES:**  Oh, dear.

| | |
|---|---|
| 1 | **THE COURT:**  What about now?  Can you hear me now? |
| 2 | **MR. JONES:**  Yes. |
| 3 | **MR. TYNAN:**  I can hear you, Your Honor. |
| 4 | **THE COURT:**  Can you hear me now? |
| 5 | No. |
| 6 | **MR. RENTERIA:**  I think he still has -- we turned up |
| 7 | the white noise, Judge, to see if it's any better. |
| 8 | **THE COURT:**  Can we turn this one down?  Well, that's |
| 9 | just hardly tolerable. |
| 10 | **MR. RENTERIA:**  If you want the white noise less, we |
| 11 | can turn the volumes of the microphones down. |
| 12 | **THE COURT:**  I think we might have to do that. |
| 13 | Mr. McCarthy, can you hear me now? |
| 14 | He's not nodding. |
| 15 | Mr. Reifler, can you hear me now? |
| 16 | Apparently not. |
| 17 | That's at least better, but the white noise is awful, isn't |
| 18 | it? |
| 19 | **MR. RENTERIA:**  If for some reason you need them |
| 20 | louder, we can turn the speaker volume louder here. |
| 21 | **THE COURT:**  Can you turn the microphone down? |
| 22 | **MR. RENTERIA:**  Yes, ma'am, we can.  It's underneath |
| 23 | the bench. |
| 24 | **THE COURT:**  Oh, okay. |
| 25 | **MR. RENTERIA:**  Just yours or all of them? |

```
 1              THE COURT:  I don't know who they could hear.
 2         (The following occurred in open court.)
 3              THE COURT:  Mr. McCarthy, could you hear all of us
 4    earlier or just me?
 5              MR. MCCARTHY:  I could hear you the best.  I could
 6    hear them, but I couldn't make out what they were saying.  But
 7    once --
 8              THE COURT:  This is my problem because I speak too
 9    clearly.
10              MR. MCCARTHY:  But once the white noise was turned up,
11    all of your voices -- your voice especially, Your Honor -- I
12    couldn't hear.
13              THE COURT:  Okay.
14              MR. JONES:  Can we stick Mr. Green in the corner and
15    use him as a mock juror?
16              THE COURT:  Mr. Green, can we impose on you?
17              MR. MCCARTHY:  Do you want me to sit over --
18              THE COURT:  I'm going to ask Mr. Green to do it.
19         Just pretend you're a juror.
20              MR. GREEN:  The closest probably?
21              THE COURT:  Yeah, we'll see how that works.
22         (The following bench conference occurred while testing the
23    equipment.)
24              MR. JONES:  I expected if I had an objection, this is
25    probably the volume at which I would try to talk and be heard
```

1 and understood by the court reporter.

2       **MR. TYNAN:**  Same, Your Honor, this is my volume.

3       **THE COURT:**  All right.  And I will say denied, denied,

4 denied, always denied, overruled, overruled, Rule 403.

5    (Conclusion of the bench conference.)

6       **THE COURT:**  Could you hear us, Mr. Green?

7       **MR. GREEN:**  I could not.

8       **THE COURT:**  All right.  Great.

9       **MR. RENTERIA:**  And the court reporter got everything

10 y'all said?

11       **THE COURT:**  You got it all?  Okay.

12    The record will reflect that we have tried out the bench

13 conference system, and after a few glitches, it appears to be

14 working so that I could hear the lawyers; they could hear me;

15 the court reporter could hear all of us; and nobody else in the

16 courtroom could hear us.  So I think we're set with that.

17    I hope we will not need many bench conferences.  I really

18 appreciated all the heads-up that y'all gave me in the trial

19 briefs about the evidence issues likely to occur.  Thank you.

20 I'll be prepared.

21    Now, I have in a couple of cases been able to say to the

22 jury and the jury panel that all the lawyers and the defendant

23 and all the courtroom personnel have been vaccinated because

24 I've been vaccinated and boosted, and I don't mind telling

25 them.  I think it's a little reassuring to people.  If all of

1   you have been boosted or at least vaccinated and are willing to

2   share that, we can tell them that.  If everybody is not, then,

3   of course, I will not.  I'm giving you a moment to consult.

4           **MR. TYNAN:**  Your Honor, the Government doesn't have

5   any objection to that.

6           **THE COURT:**  You've both been vaccinated then?

7           **MR. TYNAN:**  Both been vaccinated and boosted.

8           **THE COURT:**  All right.

9           **MR. JONES:**  So I believe everybody here has been

10  vaccinated.  However, I may be having somebody from my office

11  to help with the computer -- help with that part, and I

12  don't -- I'm not quite positive of that person, so I'm not in a

13  position to --

14          **THE COURT:**  To say?

15          **MR. JONES:**  That's correct.

16          **MR. TYNAN:**  I assume our law clerk who will be helping

17  us with exhibits and things like that is also vaccinated, but

18  I'm assuming that.

19          **THE COURT:**  How about if I just say the people at

20  counsel table -- that would be accurate -- and courtroom

21  personnel have been vaccinated.  I can't speak for everybody in

22  the courtroom, but for the people in the well, I will --

23          **MR. JONES:**  I think that -- we would just need to

24  confirm that first.

25          **MR. TYNAN:**  Same, Your Honor.  I mean, we'll have our

1  case agent, and I assume, like all -- they're all vaccinated.

2         THE COURT:  Federal employees?

3         MR. TYNAN:  Federal employees and therefore

4  vaccinated.  But I would also like to confirm that as well.

5         THE COURT:  Well, if y'all would check in with

6  Ms. Winchester and let her know.

7      Let me ask -- speaking of people helping with the exhibits,

8  the place where we had the Government's person who managed the

9  exhibits in the last trial I did was right there, but I think

10  we may have more jurors in this case.

11         MR. RENTERIA:  So, Judge, there still is a table here,

12  and I was conferring with the Government.  I think they had

13  said they were going to put their person at the table, and

14  we'll just adjust the table over to the left so they're away

15  from the jurors and not near the table.

16         THE COURT:  All right.  That's good.  Okay.  Because

17  we just need everybody not to be in the laps of the jurors.

18      And are you going to have, Mr. Jones, your own person

19  managing exhibits, or has the Government offered to make their

20  system available?

21         MR. JONES:  I'm waiting for the Government to make

22  that offer, and I'd be happy to accept it, but --

23         MR. TYNAN:  We're happy to work with defense counsel

24  on that.

25         THE COURT:  All right.  Great.  I mean, that has been

1  what has been happening since the pandemic, even before the

2  pandemic.  You know, it's usually just easier.  So if you're

3  willing to do that -- now, for any defense exhibits, you'll

4  need to --

5          **MR. JONES:**  Yes, Your Honor.

6          **THE COURT:**  -- figure out how you're going to work

7  with that and cooperate with the Government or do it

8  yourselves.

9          **MR. JONES:**  I would anticipate, at least for any

10  substantive defense evidence, that we would have somebody to

11  work with the machine, whether it's counsel or an assistant.

12          **THE COURT:**  Okay.  Good.

13      Now, my -- my thought was let's do logistics first, and

14  then I'll hear from you on the other stuff.

15      The voir dire, jury selection, here is what I propose --

16  I'm not going to tell you everything I'm going to tell the jury

17  because most of it is just the usual stuff.

18      All right.  The defense -- the Government attorneys I need

19  to introduce, Mr. McCarthy and Mr. Tynan; the defense

20  attorneys:  Mr. Jones, Mr. Silverblatt, and Mr. Topetzes.

21  Right?

22          **MR. JONES:**  Yes, Your Honor.

23          **THE COURT:**  And, Mr. Green, are you going to be here

24  for the whole time?  Do you need to be introduced?

25          **MR. GREEN:**  No, Your Honor.  We'll have at least one

1  person from our office probably seated back here just to be

2  available to answer any questions for our colleagues.

3          **THE COURT:**  All right.  Thank you, Mr. Green.

4      I intend to tell the jury at the very beginning, you know,

5  when we're starting jury selection, that the defendant,

6  Mr. Reifler, is charged with four counts of wire fraud and one

7  count of perjury.  The Government contends these events

8  occurred between August and October 2016, although some of the

9  background occurred as early as 2015.  He has entered a plea of

10  not guilty to those charges, and we're ready to select a jury.

11     More specifically, you will hear evidence that Mr. Reifler

12  was an investment advisor working with North Carolina Mutual

13  Insurance Company in Durham and Port Royal –– I wasn't sure of

14  the full name of that reinsurance company, though I think

15  Mr. Jones put it in his trial brief.

16         **MR. JONES:**  I did, but I think the Court has already

17  tread into disputed facts.

18         **THE COURT:**  Uh-huh.  Right.  Exactly.  I said, "You

19  will hear evidence that..." and then "the Government contends

20  that he...."

21     Will they not hear evidence that Mr. Reifler was an

22  investment advisor?

23         **MR. JONES:**  Well, we'll also hear evidence that he was

24  not an investment advisor, and my concern was the Court

25  saying –– forecasting the Government's evidence and not the

1  defense evidence.

2         **THE COURT:**  Right.  Hold on.

3      (Pause in the proceedings.)

4         **THE COURT:**  What's the full name of this reinsurance

5  company?  Port Royal what?

6         **MR. TYNAN:**  Reassurance Company, Your Honor.

7         **THE COURT:**  Reassurance?

8         **MR. TYNAN:**  Yes.

9         **THE COURT:**  And where are they?

10         **MR. JONES:**  They're at Cayman Islands.

11         **MR. TYNAN:**  Cayman Islands.

12         **MR. JONES:**  And they have an SPC, so they're Port

13  Royal Reassurance Company SPC Limited.  So the SPC means

14  special purpose company limited.

15         **THE COURT:**  So this is what I will intend to say:  You

16  will hear evidence that Mr. Reifler was an investment advisor

17  working with North Carolina Mutual Insurance Company -- you'll

18  hear evidence from the Government that Mr. Reifler was an

19  investment advisor working with North Carolina Mutual Insurance

20  Company in Durham and Port Royal Reassurance Company in the

21  Cayman Islands.  The Government contends that Mr. Reifler

22  devised a scheme or artifice to defraud North Carolina Mutual

23  and Port Royal -- or just North Carolina Mutual?

24         **MR. TYNAN:**  Your Honor, the indictment alleges

25  North Carolina Mutual Life Insurance Company.

1    **MR. JONES:** Yes.

2        **THE COURT:** Okay. And that he transmitted or caused

3    to be transmitted communications over wires, specifically

4    emails, in furtherance of that scheme to defraud. Mr. Reifler

5    denies he was an investment advisor.

6        Is that right?

7        **MR. JONES:** For North Carolina -- yes, that's correct.

8        **THE COURT:** And denies that he had any scheme to

9    defraud anyone.

10       Is that right?

11       **MR. JONES:** That's correct.

12       **THE COURT:** Okay.

13       **MR. JONES:** And I think the other place early on was

14   the first connection after "investment advisor working with

15   North Carolina Mutual." I mean, that's -- you have this

16   reassurance company that's in the middle, so I don't know that

17   there are allegations that he was working directly for

18   North Carolina Mutual versus an investment advisor for a

19   reassurance company. Even though we dispute them, I think

20   that's what the allegations were.

21       **THE COURT:** Well, you know, this is just to give them

22   a general idea and introduce them to the general points.

23   "Working with," that's pretty vague, and I can certainly say he

24   denies he was an investment advisor for North Carolina Mutual

25   or for Port Royal.

1          **MR. JONES:**  That's right.  I think you can describe
2    him -- say -- their accusation is that he's working -- is an
3    investment advisor --
4          **THE COURT:**  On behalf of?
5          **MR. JONES:**  -- for Port Royal, not for North Carolina
6    Mutual.
7          **THE COURT:**  Well, I don't know who he was working as
8    an investment advisor for.
9          **MR. JONES:**  And that's my concern with presenting it
10   that way.
11         **THE COURT:**  But, I mean, they just need to know at
12   this point that this is about investing funds that belonged to
13   North Carolina Mutual Insurance Company.  That -- you know,
14   that's what they need to know, right, for purposes --
15         **MR. TYNAN:**  That's certainly the Government's point of
16   view, but I believe -- I believe defense disputes that, so...
17         **THE COURT:**  Well, I have to tell them something to
18   find out if they can be fair, Mr. Jones.
19         **MR. JONES:**  I understand, Your Honor.
20         **THE COURT:**  So what do you want me to tell them,
21   besides that your client is not guilty, which I'm not going to
22   do?  I mean, that's the question.
23         **MR. JONES:**  No, I think you can say that the
24   Government contends that Mr. Reifler was an investment advisor
25   for Port Royal Reassurance Company, which was a reinsurer for

1  North Carolina Mutual.

2      **THE COURT:**  Is that all right with the Government?

3      **MR. TYNAN:**  I believe that's fine.  I mean, I think

4  it's probably more accurate to say "was an investment advisor

5  for Port Royal Reassurance Company to invest trust assets on

6  behalf of North Carolina Mutual Life Insurance Company."

7      **MR. JONES:**  That would be fine.

8      **THE COURT:**  Okay.  So -- did you get that?

9      Yes.  Absolutely.  Great.

10     Okay.  So we'll say it that way.

11     And then I'll say:  Mr. Reifler denies he was an investment

12  advisor for Port Royal and denies he had any scheme to defraud

13  anyone.

14     **MR. JONES:**  Yes, Your Honor.

15     **THE COURT:**  Yes.  All right.

16     And then burden of proof, all that stuff.  That's,

17  basically, all I intend to tell them for purposes of jury

18  selection.

19     And I will, of course, ask them if anybody knows the

20  Defendant, the lawyers.  I'll have to have your witness lists

21  so I can be sure they don't have any -- I mean, it's okay if

22  they actually know the person, as long as it's casual and it

23  isn't going to affect them.  We'll have to inquire if that's

24  the case.

25     I'll ask them if they have any connection to North Carolina

1  Mutual or to Port Royal.  That seems unlikely, but we certainly

2  could have somebody who has worked for or knows somebody who's

3  worked for North Carolina Mutual or who has heard about

4  financial troubles that North Carolina Mutual may have

5  experienced.  I'm just looking at the questions specific to

6  this case because I'll ask them all the usual general

7  questions.

8      Hold on.

9      (Pause in the proceedings.)

10      **THE COURT:**  All right.  Now, I'll say:  Several of

11  these charges involve allegations that Mr. Reifler was

12  defrauding or attempting to defraud a re -- an insurance

13  company by diverting money belonging to that company.  You'll

14  hear about something called reinsurance, which, generally

15  speaking, is -- anybody got a shorthand definition that I can

16  tell the jury for purposes of, you know, just asking them if --

17  I can certainly say, "Have any of you ever worked for a

18  reinsurance company?"  If they haven't, they won't know what it

19  is.  I don't have to explain it to them at this point.

20      **MR. TYNAN:**  Your Honor, the Government would be

21  satisfied -- there's -- in the background of the indictment,

22  there's a pretty concise definition of reinsurance in

23  paragraph 2.

24      **MR. JONES:**  And the defense's preference would be that

25  the Court not go about -- instructing the jury at this point

1  about the facts of the case.

2          **THE COURT:**  I've got to tell them something about the

3  facts or we can't figure out if they can be fair.

4          **MR. JONES:**  We can tell them it's a reinsurance

5  company, and if they don't know what that is, it's hard to

6  imagine how they could have any issues with it.

7          **THE COURT:**  Okay.  Well, I'll just tell them a

8  reinsurance company often works with insurance companies to

9  share risk.  How is that?  That's pretty vague.

10         **MR. JONES:**  Yes, Your Honor.

11         **MR. TYNAN:**  That's fine with the Government,

12 Your Honor.

13         **THE COURT:**  Okay.

14    And I'll ask anybody if they've ever worked in insurance or

15 reinsurance or in financial investments or as a broker or

16 financial advisor; any feelings or experience with insurance

17 companies, brokers, investment management, financial advisors

18 that would prevent them from being fair, from following the

19 law.

20    I'll ask if anybody has ever been responsible for managing

21 the financial affairs of another person, corporation, or entity

22 and if that experience would prevent them from following the

23 law.

24    I'll ask if they've ever been the victim of a financial

25 crime or any kind of fraud or embezzlement; if anyone has ever

 1  defrauded them or a close family member; if you've had money

 2  stolen from you, whether it resulted in criminal charges or

 3  not.

 4      One count relates to perjury.

 5      I'll ask if anybody is a notary or administers oaths, just

 6  so you'll know that.

 7      Have any of you, or anyone in your close family, ever been

 8  accused of making a false statement or lying under oath, or

 9  experienced a situation where someone else lied under oath to

10  your detriment, or any feelings about perjury that would

11  prevent you from following the law?

12      And those are the questions specific to this case that

13  occurred to me, but I'm very happy to hear your suggestions.

14      You know, I'll ask them all the general stuff:  Connections

15  to law enforcement, Justice Department, how long the trial is,

16  follow the law on presumption of innocence and burden of proof.

17  I'll get them to tell us a little bit about themselves, ever

18  been in the military.  We'll go over their employment, victim

19  of any crime.  I mean, I'm going to ask them specifically about

20  financial crimes, but I'll ask them generally about crimes.

21          **MR. JONES:**  If you could include a close family member

22  in any --

23          **THE COURT:**  Right, close family member.

24          **MR. JONES:**  And children.

25          **THE COURT:**  Yeah, I generally ask that, uh-huh.

 1          **MR. TYNAN:**  Your Honor, there's one other entity that

 2  might be worth mentioning, and that's the Summit Trust Company,

 3  and that's the Trust Entity 1 which is identified in

 4  paragraph 7 of the indictment, and -- for the same reason that

 5  we mentioned Port Royal and North Carolina Mutual.  Summit

 6  Trust, that name is going to come up at trial.  It would

 7  probably make sense to make sure that nobody on the juror -- or

 8  potential jurors have any sort of relationship or have invested

 9  with Summit Trust or anything like that.

10          **MR. JONES:**  I think that's fair.

11      There's also a publicly-traded, SEC-regulated fund involved

12  here called Forefront Income Trust.

13          **THE COURT:**  Forefront Income Trust.

14          **MR. JONES:**  The shorthand for that is FIT, F-I-T.

15      And then there are also -- I mean, I expect that there are

16  a number of Forefront entities that will also be discussed

17  heavily, and I'm happy to provide each of those names to the

18  Court.  But, again, it seems highly unlikely to me that --

19          **THE COURT:**  They're in New York, right?

20          **MR. JONES:**  Yes.

21          **THE COURT:**  More or less.

22          **MR. JONES:**  Yeah, but they pull investments

23  nationwide.

24          **THE COURT:**  Okay.  Well, if there's some general way I

25  can do it, you know -- if I can say various financial entities

1 with the name Forefront in the title?

2      **MR. JONES:**  If I could think on that, because we want

3 to be specific about separate corporate identities and not --

4      **THE COURT:**  All right.  Well, think about it, confer

5 with the Government; and if y'all have some suggested language

6 that you agree on, you can submit it informally through email

7 to Ms. Winchester; and I'll be glad to ask.

8      **MR. JONES:**  Yes, Your Honor.

9      **MR. TYNAN:**  Yes.

10      **THE COURT:**  Anything else y'all can think of that you

11 want me to ask?

12      **MR. TYNAN:**  No, Your Honor.

13      **MR. JONES:**  No, with the same -- if there's anything,

14 we'll talk about it.

15      **THE COURT:**  As long as y'all talk about it, confer.

16 And, you know, I will -- as I've already said, if you get up --

17 I'll go through it all, and if I -- I mean, I have been known

18 to occasionally skip a question unintentionally or, you know,

19 not follow up with a juror when, perhaps, I should.  So y'all

20 should feel free when we get up there at the bench conference

21 to let me know that.

22      **MR. JONES:**  Are the jurors currently using a

23 questionnaire before they arrive and will --

24      **THE COURT:**  Yes.  It's a very -- it's a questionnaire

25 designed mostly to disclose cause, but -- you will get those --

1  they'll get here; they'll get checked in; they'll fill out the

2  forms.  They're very basic.  They, basically, just say:  Can

3  you hear?  Can you see?  Anybody involved in the criminal

4  justice system in your family?  Have you ever been convicted of

5  a crime?

6      It's things that might excuse them for cause and -- but,

7  yeah, she'll let you look at those before you come into the

8  courtroom.  You won't keep them.  You won't have copies of

9  them, but --

10          **MR. JONES:**  And I assume the form would have --

11  because I had a problem recently with out-of-district jurors.

12  It was a non (indiscernible).

13      (Court reporter requested clarification.)

14          **MR. JONES:**  There was a question in a recent jury with

15  out-of-district jurors.

16          **THE COURT:**  Well, I think there's a place for them to

17  put their address on there, isn't there?

18          **THE COURTROOM DEPUTY:**  There is.  And I think usually

19  that is taken care of before they even report.

20          **THE COURT:**  Yeah, the jury clerk usually takes care of

21  that.  But, you know, obviously, point out any problems that

22  you see; and if you want me to ask a specific question of a

23  specific juror, you know, I'll give you an opportunity.

24      I will say that after the first round, usually I -- I say,

25  "Do you need to approach the bench?"  And a lot of times people

1  say, "No." So if there's nothing you want to ask, you don't

2  have any challenges for cause -- there's nothing else you want

3  me to ask and you don't have any challenges for cause, we don't

4  have to come up to the bench. But say "yes" if there's

5  something. Okay.

6      All right. Got that done.

7      Now, once we get a jury and we get them impaneled, I'll

8  instruct them, the usual instructions, opening -- well, let me

9  go back because one of the things I need to tell the jury

10  during selection is how long the case is going to take.

11      So we're -- if we start on Monday, the 14th, and most of

12  that day is jury selection -- maybe we'll get the opening

13  statements done -- then we'll have four trial days. The next

14  week Monday is a holiday, so we'll have four trial days after

15  that.

16      My usual practice is 9:30 to 12:30 or 12:45, take about an

17  hour and 15 minutes for lunch since Mr. Reifler is not in

18  custody. That's usually plenty of time. Come back at 1:45 or

19  2:00, depending on when we went to lunch, and stop by 5:00.

20  We'll take a 15-minute break midmorning and midafternoon. It's

21  right around six hours trial time per day, a little --

22  sometimes it works out a little less, and -- so what's the

23  Government thinking?

24          **MR. TYNAN:** Yes, Your Honor. Anticipating one of the

25  things I wanted to raise today, which is that we are

1  streamlining our case, as the Court predicted last fall,

2  significantly, so I actually think, with the understanding that

3  we would start with witnesses on Tuesday morning –– Tuesday,

4  Wednesday –– there is –– there is a chance, depending on the

5  length of cross-examination and other evidentiary issues, that

6  we could finish by Thursday.  I mean –– and –– even if –– and

7  potentially late Wednesday if –– you know, if the crosses

8  aren't long or there aren't any issues.  So we are definitely

9  streamlining our case and can be ready probably to finish our

10 case, at the latest, by the end of that week.

11          **THE COURT:**  All right.  Great.

12      What's the defense thinking?

13          **MR. JONES:**  And, obviously, it's going to depend on

14 what falls by the wayside by streamlining and how we perceive

15 the witness' testimony and how much cross needs to be done.  I

16 don't anticipate a rebuttal case lasting more than two and a

17 half to three days.

18          **THE COURT:**  All right.  So that –– great.  So it

19 sounds like we can probably get it done in two weeks.

20          **MR. JONES:**  That has been our hope.

21          **THE COURT:**  Yeah.

22          **MR. TYNAN:**  Easily, from the Government's view.

23          **THE COURT:**  All right.  Good.

24      Well, that's what I'm going to tell the jury, this week and

25 next week.  Of course, I always blame it on them.  I always say

1  I never know how long the jury is going to deliberate, because

2  I don't, and, you know -- but that should not be a problem.

3          **MR. JONES:**  That's right.

4      And I may just have something -- a screw loose somewhere,

5  but for some reason, I thought that they changed the holiday

6  structure this year so that the 21st was no longer a federal

7  holiday.

8          **THE COURT:**  Is that right?

9          **MR. JONES:**  Maybe I'm just completely --

10         **THE COURT:**  You know, they made Juneteenth a holiday.

11         **MR. JONES:**  Right.

12         **THE COURTROOM DEPUTY:**  No, it's a holiday.

13         **THE COURT:**  It's still -- it's still President's Day.

14         **MR. JONES:**  Yeah.

15         **THE COURT:**  Okay.  Well, I'm going to assume it's a

16  holiday.  I believe that it is.

17         **MR. JONES:**  That's fine.

18         **THE COURT:**  I don't know.

19         **MR. JONES:**  This might be a good place -- we --

20  obviously, one of our challenges is coordinating witnesses, you

21  know, and so we were going -- I wanted to bring to the Court

22  the possibility -- should we still be going on, we have one

23  witness who's important, but who may not be able to make it

24  should he have to appear on the 22nd.  So the question would be

25  if -- if we could call him out of order potentially, should we

1  need to.

2          **THE COURT:**  I'm generally agreeable to that.  I don't

3  know about interrupting the Government's case, but, you know,

4  it sounds like they're going to be finished well before that,

5  so that ought to be okay.

6          **MR. JONES:**  Yes, ma'am.  I'll coordinate with

7  Mr. Tynan and give him more details about that.  I just wanted

8  to preface that that may be --

9          **THE COURT:**  It is my general practice to ask routinely

10  throughout the trial, while we're in the Government's case when

11  we break for lunch, "Who are your witnesses going to be this

12  afternoon?"  And when we break at the end of the day, "Who are

13  your witnesses going to be tomorrow?" both for me and for

14  defense counsel.  And then when it's Defendant's turn, I do the

15  same thing.  But I would expect y'all to be communicating about

16  that.

17          **MR. JONES:**  Yes, Your Honor.

18          **THE COURT:**  And if the Government would, as you

19  approach finishing up, you know, give us some notice so that

20  the Defendant can have their witness here.

21      You know, I assume I may need to hear from you at the close

22  of all the evidence, but I would hope that we could do that at

23  lunch or five o'clock or, you know, whatever, rather than make

24  the jury sit around and wait.

25          **MR. JONES:**  Yes, Your Honor.

1      **MR. TYNAN:**  Your Honor, on witness coordination, all
2  but two of our witnesses, I think, are from out of town; and so
3  if we're operating under the understanding that we're most
4  likely not going to get a witness on the stand on Monday,
5  request the Court's permission, with, you know, the consent of
6  the defense, to agree that we're not going to put on any
7  witnesses until Tuesday morning just because I --
8      **THE COURT:**  I don't actually see any way we can do
9  that anyway because of the -- of how -- if it weren't a
10 pandemic and we could pick a jury the normal way, we would be
11 able to put a witness on on Monday, but because that -- I mean,
12 I think I can only get 22 or 23 people in here for jury
13 selection and --
14     **MR. JONES:**  Either way, Your Honor, we're comfortable
15 with agreeing not to start witness testimony until the 15th.
16     **THE COURT:**  All right.  But you may have to do your
17 opening statements on that day.
18     **MR. TYNAN:**  That's perfectly fine with the Government.
19     **THE COURT:**  Okay.
20    Oh, during jury selection, public access will be by way of
21 a remote video feed, probably in Courtroom 2, possibly in
22 Judge Auld's courtroom, somewhere else.  We will not have room
23 in here for anybody other than us and the jurors.
24    So, you know, if you have people -- you have people who
25 want to watch, Mr. Green, or otherwise, you know, probably

1  they're going to have to watch it remotely at least until, you
2  know, we're kind of well into the jury selection and some space
3  opens up.  So if y'all have anybody else in your law firms who
4  wants to come -- I don't know who you might have.  But they're
5  going to have to watch it with the rest of the public until
6  space opens up.
7      Now, once we get the jury selected, we'll have the
8  courtroom open.  I have -- we have not had any problems so far
9  with too many people in the public spaces.  Should that become
10  a problem, I'll ask -- we'll figure out a video feed.  But I
11  haven't had any problems with that.  So we'll make the whole
12  trial publicly available.
13     I do need a set of -- a couple of sets of paper exhibits.
14  So the courtroom clerk requires a paper copy.  The exhibit is
15  the paper copy the clerk has.  And I need an extra set of paper
16  copies for me and my law clerk to share.  The court reporter
17  prefers a thumb drive, so you don't have to make the third
18  paper set; okay?
19          **MR. TYNAN:**  Great.  Thank you.
20          **THE COURT:**  Yeah.  And everything should be premarked
21  with exhibit numbers so we -- you know, we don't have any
22  pauses to deal with that.
23     Y'all have or will be trained on the courtroom technology
24  and all of that?  All of that is in place?  Okay.
25          **MR. JONES:**  And just so the Court knows, our plan for

1 defense exhibits would be to premark them as best we can,

2 recognizing then there may be gaps, depending on what evidence

3 actually comes in.

4     **THE COURT:** I don't expect -- I'm sure that the jury

5 would be quite happy if you did not introduce every single

6 exhibit you had premarked, and I will glad to say that to the

7 jury, that, you know -- I -- I'm always willing to be the bad

8 guy because they never think I am and, you know, to tell them I

9 made y'all premark the exhibits so there could be gaps, and

10 they shouldn't draw any inferences from that. So if I end up

11 needing to do that, just ask me. I'll be glad to.

12     **MR. TYNAN:** The Government, you know, certainly

13 expects not to introduce every premarked exhibit, so just

14 making the Court aware of that.

15     **THE COURT:** Yeah, that's usually what happens. I'll

16 tell them that, and if I forget, y'all remind me. I don't mind

17 being reminded.

18   Okay. If y'all are going to have any stipulations, you

19 know, I do sometimes tell the jury that in preliminary

20 instructions. So please -- you know, I would -- you don't have

21 to file them before the trial, but it's a little easier if you

22 do.

23   Now, in the preliminary instructions, once they're

24 impaneled, you know, I'll tell them how the trial will work.

25 I'll tell them what "sustained" and "overruled" means. I'll

1 tell them about bench conferences, what is and is not evidence,

2 tell them about the schedule.  I'll tell them about the

3 presumption of innocence, the burden of proof, reasonable

4 doubt.

5   Now, this is what I intend to tell them in my very general

6 summary of the law:  I will give you detailed instructions on

7 the law at the end of the case, and those instructions will

8 control your deliberations and decisions.  But to help you

9 follow the evidence, I will now review the basic elements of

10 the charges against Mr. Reifler.

11   In Counts One through Four, Mr. Reifler is accused of wire

12 fraud.  To find him guilty of wire fraud, you must find that he

13 knowingly devised a scheme or artifice to defraud the

14 North Carolina Mutual Insurance Company, that the scheme to

15 defraud involved a material misrepresentation or concealment of

16 material fact, that he acted with the intent to defraud, and

17 that in executing the scheme he transmitted or caused to be

18 transmitted communications by wire, such as over the Internet.

19         **MR. TYNAN:**  Fine with the Government, Your Honor.

20         **MR. JONES:**  Your Honor, I think the piece that's

21 missing is what a "scheme to defraud" is.

22         **THE COURT:**  I appreciate that, but you know --

23         **MR. JONES:**  Our position is a simple fix is to obtain,

24 you know, money or property.

25         **THE COURT:**  Yeah.  You know, we appear to be all

1  uncertain about all of that.  I mean, we all had massive

2  discussion about that before.  So I think this covers it

3  generally.  We'll get into that with the final instructions.

4      And I don't know how else you would defraud –– what else

5  you would defraud somebody of besides money or property.

6          **MR. JONES:**  Well, I mean, people get tricked into

7  doing all sorts of things, you know, believe in all sorts of

8  stuff.

9          **THE COURT:**  Yeah, but fraud kind of –– I think that's

10  inherent, but we'll talk about it at the final instructions.

11      Count One concerns an August 12th, 2016, email; Count Two

12  concerns another email.  This one on or about August 18th.

13  Count Three is an August 23rd email and Count Four is an

14  August 24th email.

15      Just kind of give them the dates and not really say

16  anything else about that beyond the dates.

17      The jury will decide whether these emails were sent,

18  whether they were part of a scheme to defraud, whether

19  Mr. Reifler knowingly devised a scheme to defraud that he

20  executed in part by means of these wire transmissions via

21  email.

22      Just, you know, letting them know that's their job.

23      In Count Five, Mr. Reifler is accused of perjury.  To find

24  him guilty of perjury, the jury must find that on or about

25  October 26th, 2016, he signed a declaration under penalty of

1  perjury subscribing to material facts as true when he knew
2  those facts were false.  It is not enough if he was mistaken or
3  confused.  The Government has to prove the statements were
4  deliberately false.
5          **MR. JONES:**  No objection to that.
6          **MR. TYNAN:**  That's fine with the Government.
7          **THE COURT:**  Okay.  And reasonable doubt; conduct of
8  the jury, all those rules they have to follow:  don't talk
9  about it, don't form an opinion, don't conduct independent
10  investigation, et cetera, et cetera; housekeeping; notes.  I
11  let jurors take notes.  They will leave the notes in the
12  courtroom during the trial, but they may take them with them
13  during deliberations.  I'll give them some cautions about that.
14      That's it.  You know, I'll cover all the usual stuff, which
15  I've not covered here.
16      Any questions about those preliminary instructions?
17          **MR. TYNAN:**  No, Your Honor.
18          **THE COURT:**  So now I am -- oh, and -- I assume in the
19  exhibits that -- you know, if there is personal protected
20  information that's not necessary, you know, you can redact it
21  from the exhibits.  It's just easier in the long run.  I mean,
22  we don't put the court exhibits online, but they are publicly
23  available.  So if there is -- if it's not necessary -- you
24  know, you can redact people's social security numbers or
25  whatever, if there's stuff like that.

1     And I know from the trial briefs, it sounded like the

2  Defendant was not -- it sounded like the Government was going

3  to have to ask all the foundational questions about all the

4  exhibits; is that right?

5          **MR. JONES:**  I think they certainly can attempt to move

6  exhibits under 902(11), so long as they do so in compliance

7  with the rule.

8          **THE COURT:**  Okay.  Well, if there's -- you know, it

9  just takes a long time to ask -- to go through with witnesses

10  sometimes the found -- foundational questions, you know, was

11  this created in the course of -- regular course of business,

12  whatever; and if there really isn't any dispute about that, if

13  we can skip it, that saves time and makes things more efficient

14  and interesting -- or I should say less boring.

15     So, you know, if the Defendant is in a position to do that

16  about any exhibits, you know, please let the Government know.

17     Otherwise, they certainly don't have to do that, and you'll

18  just have to ask your questions.

19     All right.  Now, I am to the issues raised in the trial

20  briefs and the motions, and it is -- we've been in here an

21  hour.

22     We'll talk about how long your closing arguments are going

23  to be later when we get to that stage of the trial, but to help

24  me plan the first day of the trial, how long does the

25  Government anticipate needing for your opening?

1          **MR. TYNAN:**  10 to 15 minutes, Your Honor.

2          **THE COURT:**  Mr. Jones?

3          **MR. JONES:**  I would have anticipated 25 to 35,

4   Your Honor.

5          **THE COURT:**  Okay.  So it sounds like we need maybe 45

6   minutes, possibly, for opening.  That's great.  Very

7   reasonable.  If that changes, please let me know.  I wouldn't

8   think you would need any longer than 30 minutes.  You know, if

9   you can't explain it in 30 minutes -- you can practice on a

10  fifth grader -- it's a really good test -- or a ninth grader.

11  Jurors are very intelligent, but this is kind of complicated

12  stuff, so you need to -- I need you to break it down, not to

13  mention the jurors.

14      So I read the briefs on the pending motions.  How about we

15  hear -- we deal with the motion to dismiss the indictment, and

16  then after that we'll take a short break and come back.

17      Okay.  So what else does the Defendant want to say, since

18  it's your motion?

19          **MR. JONES:**  Well, thank you, Your Honor.  I appreciate

20  the Court looking into it and giving it the attention it

21  deserves.

22      It was a real concern to us when -- after the last motions,

23  we received the grand jury testimony of Joel Schreiber, and we

24  think that there is a substantive difference between a witness

25  that is subject to being impeached, which we very clearly

1 believe that Schreiber is subject to being impeached wholly and
2 fully, and where the testimony itself has these little indicia
3 and pieces of it which demonstrate its untrustworthiness.

4 And *Bank of Nova Scotia* sets out an analysis by which if
5 there is grave doubt about the grand jury proceeding or it's
6 perceived that this improper testimony casts doubt, you know,
7 on how the process went, that that's a basis to dismiss on Joel
8 Schreiber's testimony.

9 The motion does not argue that the Government intentionally
10 suborned perjury. I'm not doing that here, and I want to be
11 very clear about that.

12 But we do believe that the statements that Joel Schreiber
13 made to the grand jury were false, and there was evidence in
14 the record and in the other discovery which demonstrated their
15 falsity. There were key corporate entities that he owned
16 which --

17 **THE COURT:** So can you address the Government's
18 arguments? I mean, I read your brief, but then I read the
19 Government's brief, and I looked at their attachments, and it
20 sounds like these are jury arguments that you should make.

21 **MR. JONES:** Well, so the point is Schreiber was the
22 only civilian witness in front of the grand jury. Major pieces
23 of this case hang on Joel Schreiber.

24 **THE COURT:** That's often the case.

25 **MR. JONES:** Yes. And so where you have a witness

1  whose testimony in front of the grand jury is so demonstrably
2  false, that casts doubt on the grand jury process, right?  It's
3  one thing that you may be able to impeach a witness, but that
4  can rise to the level, under *Bank of Nova Scotia,* where the
5  entire process of the grand jury is now tainted by that
6  improper testimony.

7      **THE COURT:**  Right, but that -- that begs the question,
8  which is what I'm asking you to address, which is -- when I
9  read the Government's brief after reading yours and then I
10  looked at their attachments, it -- I am questioning whether it
11  rises to that level of demonstrably false, which is, I think,
12  the phrase that you're relying on.

13      **MR. JONES:**  Yes.  And we don't think that it's a close
14  question about whether it's demonstrably false.  If you look at
15  the corporate entities, he denied knowledge of his own
16  corporate entities, and not only did he deny it, he denied it
17  in contradiction of other sworn testimony saying, "Yes, that's
18  mine."

19      So the inference that's made by that passage is, is this
20  made up, right?  Is this false information?  Do you even know
21  who this company is that purportedly is your company?

22      And he tells the grand jury, "I don't know who that is,"
23  but he has told under oath, "That's my company."  So the answer
24  is if -- what if Joel Schreiber had told the truth?  He would
25  have told the jury, "Yes, that's my company."  And that would

1  have an impact.

2     When he's asked about a number of these documents -- "Do

3  you know who Port Royal is?"  He signed the agreement with Port

4  Royal, and he says now, "I don't know who that is"?  There are

5  emails sending him the money that he got from Port Royal, and

6  he says, "I don't know who that is"?  And it's the Government

7  that's showing him the emails where he gets the money that says

8  here's all this money from Port Royal, and he says, "Grand

9  Jury, I don't know who Port Royal is."  Right?  And so he

10  denied knowledge of --

11          **THE COURT:**  But didn't he explain that to the grand

12  jury, why he didn't know?

13          **MR. JONES:**  His response was maybe he was in a hurry;

14  it got switched out.  It's just facially incredible given, you

15  know, the evidence here, given his other testimony.

16          **THE COURT:**  Well, I mean given, that's the problem.

17          **MR. JONES:**  Yes.

18          **THE COURT:**  I mean, given.

19          **MR. JONES:**  Yes.

20          **THE COURT:**  It requires so much context.  And when I

21  looked at the Government's response and I read their

22  attachments, I'm like, "Well, I don't know.  They could impeach

23  him."  You know, it has -- you have to show that it's

24  demonstrably false, which I don't know exactly what that means,

25  but -- because as far as I could tell, there have been

1 absolutely no cases where a court has actually done this, no

2 Fourth Circuit cases certainly that I saw. Maybe I'm wrong,

3 but -- you know, so what does it actually mean?

4             **MR. JONES:** What we --

5             **THE COURT:** There's lots of cases where people repeat

6 the standard you're talking about, and then they say, "But this

7 isn't one of them."

8             **MR. JONES:** What we think it means in this case is

9 that where you have this witness and where you have the

10 discovery that's built in this case and where you have the

11 documents that the Government is showing to this witness that

12 contradicts his own testimony and they don't ask that next

13 question -- all right -- it's in those cases where you can say

14 it's demonstrably false.

15     This was not a case that just came up, you know, out of

16 nowhere, right? I mean, it came -- and part of the allegations

17 of this indictment are from the civil case, right? Civil

18 documents from that case are relevant here.

19     And so Joel Schreiber is a known entity and was a known

20 entity, and when he gets in front of the grand jury and

21 disclaims any knowledge of key companies that he owns, having

22 done so in other proceedings and under oath in other

23 proceedings, we think that that is demonstrably false and

24 something that the Government -- maybe they didn't know about

25 it, but they should have known about it, right?

1     This is an individual who other judges in other related
2  proceedings have found him to be incredible, and we think his
3  credibility is just so utterly terrible and his statements
4  themselves against the other discovery are so demonstrably
5  false from his own testimony that where you have him as a
6  witness supporting this indictment there's a problem.

7     Now, could they bring this indictment to a grand jury
8  without those false statements and get these same charges?
9  Possibly.  Very possible, right.  And we would love for that
10  process to happen.  We would even give a tolling agreement for
11  them to go try it again.  Our problem is basing any indictment
12  off of Joel Schreiber.

13          **THE COURT:**  Well, you have to show prejudice.

14          **MR. JONES:**  Yes.

15          **THE COURT:**  So if they could get an indictment without
16  it, then how do you show prejudice?

17          **MR. JONES:**  I think they're certainly -- they're
18  willing to try, and I'm not saying they can.  But that, I
19  think, is what the appropriate next step should be given his
20  involvement in this indictment against Mr. Reifler.  I think
21  the appropriate resolution is the dismissal of Counts One
22  through Four, and should they then attempt to, you know, go
23  back and do their case without the grand jury having been so
24  tainted, you know, we may get there.

25     But that's not what the grand jury heard, right?  The

1  question is whether or not the process was so affected by the

2  false statements to cast grave doubt.  And this is not, in our

3  estimation, an example of somebody saying a small

4  inconsistency.  These are major inconsistencies going to

5  substantial matters in the case that were contradicted in the

6  records themselves, not cleared up, and it gave a presentation

7  that was false to the grand jury.

8       For that reason and given how seriously we feel about Joel

9  Schreiber's incredulity, we think it infected the entire grand

10  jury process, and the remedy is dismissal of those counts.

11           **THE COURT:**  Okay.  For the Government?

12           **MR. TYNAN:**  Yes, Your Honor.

13       I believe the Government's response brief addresses each

14  and every alleged false statement to the grand jury and shows

15  those statements were not false.  It is a gross overstatement

16  by the defense to say that these were demonstrably false

17  statements when their own motion cuts out the entire context

18  for each alleged false statement that they said occurred.

19       There was no finding by a judge that Joel Schreiber was not

20  credible.  In fact, the defense's motion totally takes that

21  quoted text completely out of context.

22       And so for these reasons, Your Honor, Joel Schreiber did

23  not lie before the grand jury, and there's no basis to dismiss

24  the indictment.

25       And, in fact, the grand -- there's one thing I do want to

1  clear up that, perhaps, was not explicit in the Government's

2  response.  This grand jury testimony was turned over in

3  September.  The defense filed a motion a month before trial,

4  while they've had the discovery the entire time.  So this is

5  not a new disclosure by the Government.

6      And so for these reasons, Your Honor, the motion to dismiss

7  should be denied.

8      (Pause in the proceedings.)

9      **THE COURT:**  Okay.  Well, I understand the law to be

10  that I can exercise supervisory authority to dismiss an

11  indictment for errors in grand jury proceedings only where

12  there's an irregularity prejudicing the defendant, and that

13  means the irregularity must have been of a constitutional

14  dimension or substantially influence the decision to indict or

15  caused grave doubt.

16      You know, so the cases do give us some understanding of

17  what that term means, but it -- you know, it can't just be

18  questions about -- general questions about credibility, and it

19  looks to me like that is what we -- what we have here.  The

20  Defendant can cross-examine the witness, if he testifies, about

21  these -- these things, and -- you know, but it doesn't look to

22  me like it was obviously perjury.  There's explanations for it

23  that the jury will decide whether they believe them or not, but

24  it doesn't look like there was demonstrably false or perjured

25  or -- testimony here.  So I'm going to --

1          **MR. JONES:**  Yes, Your Honor.  And if I could just --
2    one -- I lighted over one point that may not affect the Court,
3    but I didn't hit it, and I wanted to, for the sake of
4    Mr. Reifler.
5          The thing that was important about, from our perspective,
6    and why it wasn't just an inconsistent statement was it went to
7    the question of where the money went, right?  Where was it
8    invested is the key question, and when the witness says -- you
9    know, the documents say it was invested with this company and
10   the person who owns that company said so -- under oath says,
11   "I've never heard of it," "I don't know that company," it
12   creates this hole that that investment was not a real
13   investment to a company that he owned.  And that's the
14   prejudice that we see.
15         **THE COURT:**  Okay.
16         Did you want to say anything about that?
17         **MR. TYNAN:**  I'm not sure -- I'm not sure I quite
18   understand the argument, frankly.  I mean, the Government rests
19   on its paper these statements were not false, and -- regardless
20   of the alleged prejudice by the defense.  If there were no
21   false statements, then there could be no prejudice.
22         **THE COURT:**  All right.  Well, there's a lot of
23   entities.  It seems to me we don't have the kind of case, or
24   even really close to the kind of case, where dismissal is
25   appropriate, so I will deny the motion to dismiss.

1     And I think that means the motion to unseal the grand jury

2 testimony should also be denied given that ruling.  So that is

3 also denied.

4     The motion to dismiss the indictment is at Docket 72, and

5 the motion to unseal is at Docket 73, and the clerk will put in

6 the minute entries that those motions are denied for reasons

7 stated in open court.

8     Did anybody want to be heard on the motion to seal given my

9 ruling on the motion to dismiss?

10           **MR. JONES:**  No.  I filed it as a motion under seal --

11           **THE COURT:**  Unseal.

12           **MR. JONES:**  -- as I understood that to be the correct

13 procedure pursuant to the new civil rules.

14           **THE COURT:**  Yeah, but I don't think I need to unseal

15 it given I denied the motion to dismiss.

16     Okay.  So why don't we take about a 15-minute break.  When

17 we come back, we've got a couple of motions in limine, and then

18 I'll just roll over with y'all some of the issues raised in the

19 trial briefs -- I had a couple of questions -- just to help me

20 prepare and get ready.

21     I will just say, as another logistical matter, on your --

22 at trial I really don't like bench conferences.  First of all,

23 they're cumbersome, particularly in the pandemic, and I don't

24 like to send the jury out.  It's cumbersome in a pandemic.  So

25 I hope we will be able to avoid that as much as we can.

 1      When we come in in the morning at 9:30, before I bring the

 2 jury in, I will say, "Is there anything we need to take up

 3 before the jury comes in the courtroom?"  When I send the jury

 4 out at the morning break, I will say, "Is there anything we

 5 need to take up before we take our break?"  And when we come

 6 back, I'll say, "Is there anything we need to take up before

 7 the jury comes in?"  I'll do it at lunch; I'll do it

 8 midafternoon; I'll do it at the close of the day.  Now,

 9 possibly I might forget, but I don't usually forget because

10 I've been saying it for 28 years.

11      So, you know, it gives you a chance to say, "This is going

12 to happen in this next part and can we talk about it here?"

13 And I can hear from you.  And then when it happens, you can

14 say, one of you, "Objection," three-word summary of what we've

15 already talked about.  You know, certainly I don't want long

16 speaking objections in the presence of the jury.  I'm pretty

17 familiar with the Rules of Evidence, so all you have to do is

18 say, "Objection, Rule 601," or hear -- you know, "Objection,

19 hearsay," or "Objection, lack of foundation," you know,

20 whatever.  You don't have to give me a long song and dance

21 about things.

22      So -- now, anything I need to hear from you about, of

23 course, I want to, but let's try to do it while the jury is not

24 in the courtroom so we can be efficient with their time.  Is

25 that reasonably clear?

1    Okay.  And I'm assuming that there are no ongoing plea

2 negotiations.  I don't want to be involved at all.  I don't

3 care whether he pleads guilty or not guilty.  But if you are

4 having plea negotiations and something does change, I would

5 greatly appreciate you telling me immediately because there's a

6 lot of prep on our end, and primarily in the clerk's office, to

7 get ready for a jury trial during the pandemic.  So should

8 anything change about that, once it's certain that it has

9 changed, please let Ms. Winchester know so we can kind of step

10 back.  And, of course, I'm available at your convenience, but

11 I'm happy to try your case.  I'm not trying to get anybody to

12 plead guilty.  I just want to know if something is not -- if

13 I'm not going to have a trial, or I might not have a trial.

14    All right.  15-minute recess.

15         **MR. JONES:**  Yes, before we -- can I ask about water on

16 the table?  Can we bring in --

17         **THE COURT:**  Yes, bring -- normally we would have a

18 pitcher, but -- I hate to say "because of the pandemic" for the

19 89th time -- but if you would like to bring a water bottle in,

20 so long as it has a lid on it and you keep it closed up, you

21 can do that.

22         **MR. JONES:**  Thank you, Your Honor.

23         **THE COURT:**  I'll let the jurors do the same thing.

24    15-minute recess.

25    (An afternoon recess was taken from 3:18 p.m. until

1   3:34 p.m.; all parties present.)

2          **THE COURT:**  Okay.  Turning to the motions in limine,

3   the Defendants -- Defendant has filed one to prohibit the

4   Government or its witnesses from using the phrase "Ponzi

5   scheme," right?

6          **MR. JONES:**  Yes, Your Honor.

7          **THE COURT:**  Go ahead.

8          **MR. JONES:**  So under the Fourth Circuit, a Ponzi

9   scheme has a very well-defined definition.  It is a scheme by

10  which money is brought in by one set of investors, that there

11  are no investments made with that money, and then additional

12  investors are defrauded, and the purpose of that second

13  defrauding is to pay off the first investors with those

14  unlawfully gained proceeds.

15     A fraud generally is not a Ponzi scheme.  Paying business

16  assets or taking money from a fraud is not a Ponzi scheme, but

17  a Ponzi scheme is a specific type of fraudulent scheme that has

18  a pretty odious and stigmatizing effect on the jury.  It is a

19  bell that if rung cannot be unrung, and we don't think that the

20  evidence demonstrates a Ponzi scheme in this case and that the

21  Government, at least until a point where the Court thinks that

22  they have potentially put on evidence to that point, should be

23  allowed to do that.

24     You know, the evidence that we anticipate the Government

25  will put on in regards to a Ponzi scheme is that after a note

1  was made to a company, that company then did normal business

2  things, to include retiring of old debt, paying interest on its

3  other obligations; and it is that normal business practice -- a

4  business that's in the business of, you know, notes and

5  lending, it goes about retiring some of its debt; and the

6  allegations are that that is a Ponzi scheme because this

7  company that received the note then used it to do something

8  else, including, you know, paying off other obligations that it

9  had.  We don't think it fits, and we think it's a pretty odious

10  thing.  We can all think of classic Ponzi schemes, and this

11  just isn't what this case is about.

12          **THE COURT:**  All right.

13      For the Government?

14          **MR. TYNAN:**  Yes, Your Honor.

15      The indictment specifically alleges that the Defendant used

16  the trust assets from North Carolina Mutual to pay off prior

17  investors; and under the definition of a Ponzi scheme in the

18  Defendant's motion, that's exactly what a Ponzi scheme is.

19      And while the Government does not submit that this entire

20  case -- all of the charges in the indictment are indicative of

21  a Ponzi scheme, based on our preparation for trial, the

22  witnesses have said, you know, this -- it seemed like a Ponzi

23  scheme.  The Defendant got money in from a new source, and he

24  used it to pay off old debts.

25      And so while the Government is not going to overreach here

1  and say that every single aspect of this case is a Ponzi

2  scheme, it does expect its witnesses to describe it as such;

3  and when the witnesses describe it as such, based on their own

4  personal knowledge, the Government is entitled to make

5  arguments to the jury off of that testimony; and that's

6  appropriate -- certainly appropriate under the facts of this

7  case.

8      **MR. JONES:**  That actually hits on it exactly, is that

9  these witnesses are misusing, you know, Ponzi scheme to

10  describe conduct that isn't.  To demonstrate that it is, you

11  would have to have one set of investors who give you money,

12  another set of investors -- and this first set of investors

13  intends to get their money back with profit, right?  And then

14  you take this money and pay them off for the purposes of

15  encouraging them to invest more.  It's not simply that you --

16      **THE COURT:**  Or for the purpose of hiding your --

17      **MR. JONES:**  That's correct.  But there's no evidence

18  that there's anything improper about this other set of

19  investments that the Forefront company made that it then used

20  this second investment to pay down the debt.

21      **THE COURT:**  Well, lots of times in Ponzi schemes the

22  initial investment plan is not -- there's nothing wrong with

23  it.  It's just when things start to go south that then people

24  are like, "Okay.  I've got to go find some more investors to

25  pay off these first investors so that I don't get," you know,

1  whatever -- whatever the problem is.  They've embezzled some

2  money or things just haven't gone well and, you know, it

3  continues on.

4      So, I mean, you don't necessarily have to have fraud when

5  you receive the money from the first investors, do you?

6          MR. JONES:  No.  You have to pay out that money as

7  part of the Ponzi scheme; and that's what's not being

8  demonstrated here, is that there was anything wrong with the

9  notes that the company held, or that when it received its own

10  note and runs its own business, its payment of these debts is

11  part of a scheme to defraud anybody.

12          THE COURT:  Well, I mean, isn't that the question?

13  How can I -- that's like deciding now that the Government's

14  evidence is insufficient.

15          MR. JONES:  Right.  And what we're saying is we

16  believe that that term is prejudicial.  To refer to something

17  that we believe it's not is inappropriate, and they shouldn't

18  be allowed to call it that or call it that in opening

19  statements, and if -- you know, it's a problem with prejudicing

20  the jury by using phrases that don't apply to it.

21          THE COURT:  But they have alleged it in the

22  indictment.

23          MR. JONES:  So I think it's one thing to say that

24  investments were paid off.  It's another thing to call that a

25  Ponzi scheme.  I don't dispute what their allegations are, and

1  I think that they can -- you know, I understand what their

2  evidence is going to be, but to call that a Ponzi scheme is

3  different.

4         **THE COURT:**  Okay.  Well, I'm sure that they're not

5  going to offer personal opinions.  They're going to say, "The

6  Government contends it's a Ponzi scheme," or something like

7  that.

8         **MR. JONES:**  So the problem is we then have to educate

9  the jury about what a Ponzi scheme is and how this is not a

10  Ponzi scheme.

11         **THE COURT:**  Well, what's wrong with that?  I mean, if

12  you say it isn't a Ponzi scheme and they say it is, that's what

13  trials are for, right?

14     I mean, I'm just trying to understand how I can decide this

15  now.  It's like precluding them from offering evidence that

16  they need to prove their case because they haven't yet offered

17  evidence to prove their case.

18         **MR. JONES:**  It's the characterization of the scheme to

19  defraud as a Ponzi scheme we have the problem with.  It's the

20  use of that word.

21         **THE COURT:**  That phrase.

22         **MR. JONES:**  That's correct.  And it's because of

23  the -- we think that it's subject to misinterpretation by the

24  jury, and we think it's subject to confusion and distraction by

25  the jury.  We don't have any problem with using the words of

1  the statute, a scheme to fraud.  It's the use of that one

2  phrase, calling this a Ponzi scheme, that we've objected to.

3       **THE COURT:**  All right.

4     Did you want to say something else, Mr. Tynan?

5       **MR. TYNAN:**  Just on the last point.

6     You know, we cited some case law in the response that Ponzi

7  scheme is a generally known concept to, you know, the general

8  population, and it carries a certain accepted definition that

9  witnesses who have the personal knowledge as to what happened

10 in this case can say that it's a Ponzi scheme, and it reflected

11 their understanding of a Ponzi scheme.  The defense will,

12 obviously, vigorously cross-examine that witness on their

13 personal knowledge as to both of those things, and that's

14 totally fair game.

15      **THE COURT:**  All right.  Well, I'm going to deny it as

16 to the opening statement, and as to -- I'm just not going to

17 prohibit witnesses from using it.  If a question is unclear

18 or -- you know, the Defendant can object at trial.  If the

19 witness uses it in an unclear way, the defense can follow up on

20 cross-examination.  I think there's ways to deal with this

21 other than prohibiting the use of the word.  Of course, if

22 we -- you know, every time I turn around somebody is using it

23 and not backing it up, we'll talk.

24    Mr. Jones, you can object again.

25    But I'm assuming that's not going to happen.

1       Now, the Government has filed a motion to preclude the

2   Defendant from blaming the victim.  I'm using the shorthand in

3   the Government's words.  So I was not -- y'all may have to

4   educate me a little bit on this one.

5       You know, when I read the briefs, the Defendant seems to be

6   correct that the interactions between the Defendant and

7   North Carolina Mutual, if any, and Port Royal are relevant.

8   So, you know, we can't keep those out.  And, you know, you

9   can't, I don't think, blame the victim and say, "Well, you were

10  negligent.  You should have caught it."  I mean, I think the

11  Government is right about that point.

12      But it's hard for me to figure out exactly how to deal with

13  this generically, and it seems like it might better be deferred

14  for trial.

15      But if anybody disagrees with those two general things that

16  I just said -- you know, the interactions between Mr. Reifler

17  and the -- the victim, whose North Carolina Mutual and Port

18  Royal and its -- its managers or employees or owners, whoever

19  he was dealing with, you know, those are relevant, and yet --

20  and so that's going to come in.  But I don't think the

21  Defendant can say, "Well, this is North Carolina Mutual's

22  fault."

23      If anybody disagrees with those two points, I certainly

24  want to hear from you; and if you want to be heard further, I'm

25  glad to think this through with you.  But I'm thinking -- you

1  know, I think maybe we might need to defer this to the

2  specifics and see how it comes up at trial.

3     It's the Government's motion.  What would y'all like to

4  say?

5          **MR. TYNAN:**  Your Honor, the Government agrees with how

6  you characterized the issues; and it's fine with the Court's

7  understanding as to how the evidence is going to come in and

8  sort of the boundaries, that defense can't point the finger at

9  the victim to blame for what had happened to him.

10         **THE COURT:**  So the victim is North Carolina Mutual --

11         **MR. TYNAN:**  Yes, Your Honor.

12         **THE COURT:**  -- that's who you are --

13         **MR. TYNAN:**  Yes.

14         **THE COURT:**  Many of the interactions were with this

15  Port Royal group, right?

16         **MR. TYNAN:**  Yes, Your Honor.  My understanding is --

17  and we'll also have a witness from Summit Trust who held the

18  trust assets for the benefit of the life insurance company, and

19  so they're on similar planes in the sense that they're holding

20  the money for the benefit of North Carolina Mutual.

21     And the purpose of the Government's motion was to say we're

22  going to object if the defense argues to the jury that it was

23  all their fault; they should have done a better job of doing X,

24  Y, Z.

25         **THE COURT:**  North Carolina Mutual or Summit or Port

1  Royal?

2          **MR. TYNAN:**  Correct, Your Honor.

3          **THE COURT:**  All of them?

4          **MR. TYNAN:**  Well, specifically North Carolina Mutual

5  and Summit Trust.

6          **THE COURT:**  Okay.

7          **MR. TYNAN:**  And the defense's response to our motion

8  was, you know, well, that excludes a whole category of

9  evidence.  That's not what the Government is saying.  The

10  Government does not dispute that interactions between the

11  Defendant, Summit Trust, and North Carolina Mutual are

12  relevant, and we plan to put on evidence regarding those

13  interactions.

14          **THE COURT:**  All right.

15          **MR. JONES:**  I'd agree.  And I think as part of that

16  interaction, promises as part of contracts made between the

17  parties about the trust money, you know, and obligations that

18  they promised to do in relation to it fall into that category.

19          **THE COURT:**  All right.  Well, if anybody thinks we

20  have a question or an answer at trial that constitutes blaming

21  the victim, you know, just object, and I'll rule on that at

22  trial.

23      So those are the motions in limine.

24          **MR. JONES:**  There was one other, Your Honor, that I

25  think I briefly raised in the trial brief, and it's more of a

1  motion in limine, which was -- and I don't know if this was

2  even contemplated.  But any sort of questioning or eliciting

3  questioning regarding the ownership interest or demographics of

4  policyholders of North Carolina Mutual we think would be

5  highly prejudicial to justice and to Mr. Reifler.

6        **THE COURT:**  Are you just saying some reference to the

7  fact that it was the first --

8        **MR. JONES:**  Yeah.

9        **THE COURT:**  -- insurance company owned by Black people

10  in the country?  I don't actually know that that's true, but I

11  know North Carolina Mutual has a long history of --

12        **MR. JONES:**  Yeah, we don't see any relevance

13  whatsoever to that history or to that type of information about

14  the company, and we think it can only work to prejudice.

15        **MR. TYNAN:**  Your Honor, there's a fine line between

16  arguing that the Defendant did whatever he did that's alleged

17  in the indictment based on, you know, racial motives and having

18  a witness on the witness stand, you know, tell us about

19  North Carolina Mutual.  Well, North Carolina Mutual is the

20  oldest, you know, African American-owned life insurance company

21  in the country.

22        **THE COURT:**  I don't know that it is.  I just --

23        **MR. TYNAN:**  Well --

24        **THE COURT:**  But I know it has some sort of history

25  like that.

1          **MR. TYNAN:**  And we plan to elicit that testimony.

2   It's perfectly acceptable for a representative testifying on

3   behalf of a victim to explain what the company is.  Otherwise,

4   the jury is just left with no understanding whatsoever as to

5   who the life insurance company is.  To be clear, the Government

6   is not injecting any sort of racial motive or bias or anything

7   like that into the trial, but I think it's perfectly acceptable

8   for a witness to explain what type of company North Carolina

9   Mutual is.

10          **THE COURT:**  You're talking about something that is,

11   perhaps, a little more than a passing reference, but not much

12   more.

13          **MR. TYNAN:**  Correct.

14          **THE COURT:**  Okay.

15          **MR. JONES:**  And we just don't see -- you know, if you

16   want to say when the company started or that it's in the life

17   insurance business, that's fine -- right -- but to say who --

18   the ethnicity of the original owners and who some of their

19   clients were and what role it may have played in --

20          **THE COURT:**  Okay.  Well, if at any point you think

21   they've gone too far, you just object.  You know, I think

22   they're entitled to ask a few questions about who the insurance

23   company is and its history, and if it starts taking too much

24   time, we hit Rule 403 and, you know, it goes out.  I mean, it

25   has some relevance.  It just doesn't need to take a lot of time

1   because I tend to agree with you that if it's more than, you
2   know, a little, it's not going to be real helpful to the jury.
3           **MR. JONES:**  The problem is the difference between who
4   it was in 1889 has no bearing on the company during the point
5   of this -- you know, this offense.  That's the problem, is it's
6   attempting to color who the victim is with information, you
7   know, from 130 years ago.
8           **THE COURT:**  It's very common for people -- for victims
9   to tell a little about themselves, and there is no problem with
10  that.  So I'm going to let them do that, and if at any point
11  you think they've gone too far, then you can say so.  I don't
12  have any problem with them saying in passing something about
13  its founding, but, you know, once we get to the paragraph
14  level, there's -- I'm going to be telling them to move on,
15  probably past the sentence level.  A little background, there's
16  no -- no problem with that.
17      Okay.  I looked at y'all's proposed jury instructions.
18  Obviously, we will be resolving those later at the close of the
19  evidence.
20      The perjury instructions y'all submitted both talked about
21  declarations, testimony, depositions, and certificates.  But
22  we're just talking about a declaration, right?  So that's all I
23  really need to talk about.
24          **MR. TYNAN:**  Yes, Your Honor.
25          **THE COURT:**  Okay.

1    And I know y'all didn't submit any joint instructions, but
2  a lot of what y'all submitted didn't actually appear to be all
3  that different.  Certainly, there were some differences, but --
4  and then there was an -- the Defendant, I know, put an aiding
5  and abetting instruction in.
6    Did the Government?
7        **MR. TYNAN:**  Yes, Your Honor, there is an aiding and
8  abetting as well.
9        **THE COURT:**  And how -- can you just give me a general
10  idea of how that could -- I'm not doubting you; I just don't
11  understand because I haven't heard the evidence -- but how that
12  might be relevant here?
13        **MR. TYNAN:**  Sure, Your Honor.  For counts -- for the
14  wire fraud counts, Counts One through Four, the indictment does
15  allege 18 U.S.C. Section 2.
16        **THE COURT:**  Yes.
17        **MR. TYNAN:**  And to the extent the defense argues that
18  it wasn't the Defendant who pressed the button on the email,
19  the Government would be entitled to argue that he does not
20  literally have to press the button to send the email and could
21  have caused the -- the wire in conjunction with others at the
22  time.
23        **THE COURT:**  Okay.  I think I took the statutory
24  language "caused to be transmitted" to -- to cover things like
25  "I told my assistant to do something" -- that would -- "to

1  transmit it."  Then I have caused it to be transmitted, and you

2  don't need aiding and abetting.

3      Is this wrong?

4          **MR. TYNAN:**  That's not wrong, Your Honor, but I also

5  think it could go beyond just the pressing of the button for

6  the wire transmission.  It could also be preparation of a

7  document, for example.  While maybe the Defendant was not the

8  one who put the documents together, he could have -- and I'm

9  using this hypothetically.  But he could have directed somebody

10 under his control to do so, and that certainly falls within the

11 aiding and abetting.

12         **THE COURT:**  Aiding and abetting which --

13         **MR. TYNAN:**  Aiding and abetting in the furtherance of

14 the scheme.

15         **MR. JONES:**  I think the Court put its finger on it.

16 We don't understand who it's alleged that he aided and abetted,

17 unless it's alleged he aided and abetted the person identified

18 in those counts.

19         **THE COURT:**  Right.  I mean, I guess -- I mean -- you

20 know, in a robbery case -- it got Mr. Green's attention.  Oh, I

21 know about robbery cases.  He looked up.

22     In a robbery case, you aid and abet the robber.  Here who

23 was -- I'm just struggling with this one a little bit.

24         **MR. TYNAN:**  Yes, Your Honor.  I mean, the instruction

25 that the Government proposed -- and its page 10 of its proposed

1  instructions -- for example, says:  It is possible to prove the

2  defendant guilty of a crime even without evidence that the

3  defendant personally performed every act charged.

4          **THE COURT:**  Right.

5          **MR. TYNAN:**  And so --

6          **THE COURT:**  But he personally has to devise the scheme

7  or artifice to defraud.

8          **MR. TYNAN:**  Correct.

9          **THE COURT:**  And he personally has to have the intent

10  to defraud, and you're saying maybe somebody else made the

11  material misrepresentation or concealed the fact or -- the

12  material fact or --

13          **MR. TYNAN:**  Correct.

14      And in the next paragraph in the proposed instructions, it

15  says:  "Ordinarily, any act a person can do may be done by

16  directing another person or agent."

17          **THE COURT:**  Right.

18          **MR. TYNAN:**  "Or it may be done by acting with or under

19  the direction of others."

20      And so that doesn't --

21          **THE COURT:**  But I mean, I guess -- I mean -- okay.

22  Well, I don't know.  I'll have to hear the evidence on that.

23  I'm just trying to -- I'm just struggling with that a little

24  bit because if you aid and abet someone, it means somebody else

25  is guilty with you.

1    **MR. TYNAN:**  So, Your Honor, I would agree that would
2    make sense to defer determination of the aiding and abetting
3    instruction until after the evidence comes in, and I think, you
4    know, depending on the lines of cross and argument that the
5    Defendant makes, it may or may not be relevant.
6         **THE COURT:**  Okay.
7         **MR. TYNAN:**  So the Government is fine with deferring
8    that.
9         **THE COURT:**  Well, right, we're going to defer.  I just
10   was trying to understand it a little bit.
11        **MR. JONES:**  We also have been trying to figure out who
12   it's alleged that was a principal that was aided and abetted by
13   Brad Reifler or who aided and abetted him as Brad, as the
14   principal, so --
15        **THE COURT:**  I mean, it --
16        **MR. JONES:**  There's not a conspiracy charge here.
17        **THE COURT:**  Right.  But the scheme to defraud -- I
18   think the Government is correct that the -- the Defendant does
19   not necessarily have to be the one who made the material
20   misrepresentation or concealed the material fact, or whatever
21   the third one is, so long as he, you know, was responsible for
22   it.
23        **MR. TYNAN:**  Correct.
24        **THE COURT:**  Yes.
25        **MR. TYNAN:**  Yes.  That's all the Government is getting

 1  at with the instruction.

 2          **THE COURT:**  Okay.  Do you disagree with that?  If you

 3  do disagree with that, you -- y'all need to have some, like,

 4  cases, right?

 5          **MR. JONES:**  Yes, Your Honor.

 6          **THE COURT:**  Yes.  Okay.

 7          **MR. JONES:**  I mean, we think that our aiding and

 8  abetting instruction, you know, clears up the different

 9  liability, either principal or aiding and abetting.

10          **THE COURT:**  Well, we'll figure that out when it comes

11  to the charge conference.  I didn't really have any other

12  questions about the jury instructions at this point.  It's too

13  early.

14          **MR. TYNAN:**  Your Honor.

15          **THE COURT:**  Yes.

16          **MR. TYNAN:**  Before we move off of the jury

17  instructions, there was one instruction that the Government

18  wanted to identify from the Defendant's proposed list, and that

19  was the statute of limitations instruction.

20          **THE COURT:**  Hold on.

21          **MR. TYNAN:**  And I believe it's --

22          **THE COURT:**  My screen is too far away.  I'm having

23  some problems here.  Okay.  Defendant's proposed instructions.

24          **MR. TYNAN:**  That's page 15 --

25          **THE COURT:**  Page 15?

1        **MR. TYNAN:**  -- of the Defendant's proposed

2    instructions.

3        **THE COURT:**  Okay.

4        **MR. TYNAN:**  The Government is just somewhat confused

5    as to why the jury would be instructed on, essentially, a legal

6    issue that was raised in the pretrial Rule 12 motions,

7    essentially saying that the Government hasn't alleged a scheme

8    or artifice to defraud within the statute of limitations; and

9    based on the allegations in the indictment, the Court ruled

10   that -- you denied that motion.

11       **THE COURT:**  Right.  But you do have to prove it.

12       **MR. TYNAN:**  Correct.  That's true.  That's true.  We,

13   obviously, have to prove the allegations in the indictment.  I

14   guess I just don't understand how the jury -- it's incredibly

15   confusing for the jury to receive this instruction.

16       **THE COURT:**  Juries decide statute of limitation issues

17   all the time.  I mean, it's more common in civil cases.

18       **MR. TYNAN:**  In civil cases.

19       **THE COURT:**  But in -- it's a -- if there is a question

20   of fact, then the jury would have to decide it.  I could not

21   decide it.

22       **MR. TYNAN:**  That's correct, Your Honor.

23      All I'm saying is that the instruction for wire fraud says

24   that the wire that is sent must be in furtherance of the scheme

25   to defraud, and that -- that is the decision for the jury to

1    make on a factual matter, and the wire itself was –– was sent
2    within the statute of limitations.  So it seems just somewhat
3    redundant to instruct them on both.
4              **THE COURT:**  Right.
5              **MR. TYNAN:**  It raises an element of confusion, I
6    think.
7              **THE COURT:**  Well, whether it's necessary or not, I
8    mean, that's another question because all four dates on the
9    wire frauds, they were within the five years.
10             **MR. TYNAN:**  Correct.
11             **THE COURT:**  Right.
12             **MR. TYNAN:**  Correct.
13             **THE COURT:**  I mean, that's your underlying point.
14             **MR. TYNAN:**  Correct.
15             **THE COURT:**  And to find the Defendant guilty, you're
16   saying it would have to be within the statute of limitations ––
17             **MR. TYNAN:**  Correct.
18             **THE COURT:**  –– if they find that email was in
19   furtherance of.
20             **MR. TYNAN:**  Exactly.
21             **THE COURT:**  Okay.  I see what you're saying.
22             **MR. JONES:**  And it's to be proved.  But the Court will
23   recall at the last motions hearing the Government identified
24   what it called five buckets, you know, of possible
25   misrepresentations, and several of those buckets occurred, you

1  know, now beyond the statute of limitations.  So if the jury

2  were to, you know, believe some of the evidence and not this --

3  you know, not all of it, depending on what they find, there may

4  be a statute of limitations problem.

5          **THE COURT:**  Well, we'll have to work through that.  It

6  may be, to the extent an issue like that comes up, I don't have

7  to word it in terms of the statute of limitations.  It can be

8  better dealt with in the elements or clarifying it in the

9  instructions about a particular count.

10     Thank you for drawing that to my attention.  I'll be

11  attentive to that.

12          **MR. TYNAN:**  Yes, Your Honor.

13          **THE COURT:**  Okay.  Now, that then takes me -- takes me

14  to the trial briefs, and I do appreciate y'all highlighting and

15  telling me what you expect some of the evidence issues are.

16     Has the Defendant disclosed the required information about

17  their expert?

18          **MR. JONES:**  Some.  We have turned over

19  Mr. Nordlander's qualifications.  We intend to turn over a

20  summary of his testimony tomorrow.

21     I'll tell the Court a part of the reason is that his

22  testimony is in response to the Government's sort of analysis

23  of where they see money going, and we first learned about that

24  on the 24th or 25th through the production of some exhibits

25  that were proposed demonstrative or illustrative exhibits.  So

1  his testimony is going to be responding to sort of how -- you

2  know, to that evidence.

3      And so we're working as quickly as we can.  Mr. Nordlander

4  is working quickly.  We've turned over his qualifications and

5  expect to have his summary to them tomorrow.

6          **THE COURT:**  Okay.  But you've had the evidence, you or

7  your predecessor -- I guess your cocounsel have been -- I don't

8  know about them individually, but their firm has been involved

9  in this for years and has known about the -- I mean, there's

10  been discovery about the flow of the money, right?  You've had

11  that underlying information for quite some time.

12          **MR. JONES:**  Yes.

13          **THE COURT:**  Yes.  Okay.  All right.

14      Well, whatever the rules are about that, which I haven't

15  looked up, but I'll be prepared.

16      Yes.

17          **MR. TYNAN:**  Your Honor, the Government is objecting to

18  the proposed testimony at this point in time.  I mean, this is

19  not -- we have the right to put on a rebuttal case, and, you

20  know, if we get a report or summary tomorrow afternoon -- I

21  have no idea -- I shouldn't say I have no idea, but I really

22  don't have a firm grasp on what this testimony is going to be,

23  and it needs to be prepared to rebut the Defendant's expert.

24  I'm not quite sure how we do that in, you know, essentially, a

25  week -- nine days out from trial.

1      **THE COURT:**  I'm not following exactly what you're

2  saying.  I apologize.  You're -- back up a step and start over

3  again.

4      **MR. TYNAN:**  Yes.  We're objecting to the Defendant's

5  expert at this point due to lack of notice of the proposed

6  testimony.  Rule 16 requires that, upon request, the Defendant

7  turn over a summary of the proposed testimony and the basis for

8  the proposed testimony.

9      And, you know, we had this conversation with counsel for

10  the defense.  I believe it was January 12th.  And we're

11  still -- we still don't know what this testimony is going to

12  look like, and Rule 16 specifically tries to avoid exactly this

13  situation, which is unfair surprise at trial.

14      Your Honor, I also understand that the defense may call a

15  handwriting expert, and we don't --

16      **THE COURT:**  Hold on.

17      **MR. TYNAN:**  Sure.

18      **THE COURT:**  So I'm looking at 16(b), and it at least

19  at first glance does not have any time requirements in it,

20  right?

21      **MR. TYNAN:**  So --

22      **THE COURT:**  (b)(1)(C) is specific about experts.

23      Is there a timing --

24      **MR. TYNAN:**  Well, not specifically, Your Honor, but if

25  you look at the Advisory Committee note, it says:  Rule 16

1  (b)(1)(C) is, quote, intended to minimize surprise that often

2  results from unexpected expert testimony, reduce the need for

3  continuances, and to provide the opponent with a fair

4  opportunity to test the merits of the expert's testimony

5  through focused cross-examination.

6      And at this point my understanding is that this testimony

7  is going to be opinion testimony.

8          **THE COURT:**  Is going to be what?

9          **MR. TYNAN:**  Opinion testimony.

10         **THE COURT:**  Yes.

11         **MR. TYNAN:**  And the Government has the right to

12  vigorously cross-examine that expert and test those conclusions

13  and potentially, you know, move to exclude it, that he's not

14  qualified to offer these opinions.

15         **THE COURT:**  Exactly.  I mean, the Defendant should

16  turn this over as soon as possible because every day that it's

17  not turned over increases the risk that just what you say will

18  happen.  Of course, if it's a report that only talks about, you

19  know, a little tiny thing, then it might not be a problem at

20  all.  But I appreciate what you're saying.  So every day the

21  Defendant doesn't turn it over is a risk, right?

22         **MR. JONES:**  That's exactly right.  You know -- and for

23  us, part of the context is there's an incredible amount of

24  financial data in this case that the Government isn't intending

25  to call any expert to talk about but instead a lay witness to

 1 || talk about it.  But he's doing calculations from that math -- I
 2 || mean, from all that data and saying, "These records show the
 3 || following calculations in these amounts," and our expert is, in
 4 || large part, responding, you know, to that.
 5 ||         THE COURT:  Well, isn't that just math?
 6 ||         MR. TYNAN:  Yes, Your Honor, it's a summary witness.
 7 || And if the defense expert is going to get on the stand and
 8 || opine that whatever our expert or summary witness has said is
 9 || wrong or miscalculated and we're in the middle of trial --
10 ||         THE COURT:  Right, you're entitled -- that says you
11 || have to know in advance, so --
12 ||         MR. TYNAN:  And that's not the only expert the defense
13 || intends to call based on their trial brief.
14 ||         THE COURT:  I don't know what else I can do at this
15 || point.  I can't -- there's no time limits in the rule, and
16 || unless and until they either call an expert without giving you
17 || anything, I'm not -- or never give you one and it's the first
18 || day of trial -- but, you know, if it's just a -- fairly short
19 || opinion testimony, I -- you know, it may not be a big deal, but
20 || if it is very, very -- a very, very big thing, then exactly
21 || what you say may apply.  I'll have to look at the case law on
22 || that, which I will do.
23 ||         MR. TYNAN:  I understand, Your Honor.
24 ||         THE COURT:  Yeah.  So I'll be prepared to deal with
25 || the timing issue, but I'm not seeing a timing requirement in

 1  there.  I suppose I can impose one.

 2        **MR. TYNAN:**  Your Honor, the Government understands the

 3  Court's view on this and is merely just informing the Court.

 4        **THE COURT:**  Right.

 5        **MR. TYNAN:**  To the extent we get a voluminous expert

 6  opinion tomorrow --

 7        **THE COURT:**  Right.

 8        **MR. TYNAN:**  -- or one that is insufficient to give us

 9  notice as to what the testimony is going to be, we do plan to

10  exclude the testimony at trial.

11        **THE COURT:**  All right.  Well, I'll deal with that when

12  it happens, and the Defendant is on notice.

13     And, Ms. Manning, if you can make a note that we might need

14  to look at the case law on Rule 16(b)(1)(C).

15     Okay.  You're -- the Government is going to -- normally the

16  Government has one person who stays in the courtroom for the

17  entire trial.  Is that going to be Agent Towers?

18        **MR. TYNAN:**  Yes, Your Honor.

19        **THE COURT:**  And he's a witness maybe?

20        **MR. TYNAN:**  He might be a witness.  Depending on how

21  the evidence comes in.

22        **THE COURT:**  I think you're entitled to have one person

23  be in here the entire time, even if that person is a witness.

24     Does the Defendant disagree?

25        **MR. JONES:**  I do not, Your Honor.

1          **THE COURT:**  All right.  So you can do that.

2      About the witness lists -- you know, when I tell the jury

3  about the witness list, I usually don't tell them whose

4  witness.  I just say, "Here are the possible witnesses," and I

5  don't say that the Government might call or the Defendant might

6  call because a lot of times you have the same people on your

7  list and -- you know, so I'm not going to be identifying

8  witnesses by party.

9      And you're talking -- the Government is concerned about

10  closing arguments, so, you know, we'll talk about that -- I

11  appreciate you bringing that to my attention.  We'll talk about

12  it then.

13          **MR. TYNAN:**  Yes, Your Honor.

14          **THE COURT:**  Of course, if we have any issues come up

15  with interviews or statements, I'll be ready on that.

16      It looked like the Government was correct that there was no

17  need for a jury issue on the amount of any forfeiture judgment.

18      Does the Defendant agree with that?

19          **MR. JONES:**  I don't know the answer, Your Honor.

20          **THE COURT:**  Okay.  You'll be prepared?

21          **MR. JONES:**  I will be prepared to discuss that.  I

22  have always had jury trials on those, or at least been given

23  the opportunity to waive it, but I've never -- let me take a

24  step back.  I'll be prepared to make an argument one way or the

25  other.

1    **THE COURT:** All right. When we get to the close of

2    the evidence after any motions and assuming that they are

3    denied in whole or in part -- yeah -- the first thing I like to

4    do is the verdict sheet because that drives the instructions.

5    Then after -- in this case, the verdict sheet should be pretty

6    simple. And then after that, we'll do, you know, the law. So

7    the verdict sheet is actually the first -- you need to be ready

8    first thing on the verdict sheet, and I -- it's my typical

9    practice to have drafts for everybody so we're not working from

10   scratch.

11       And I appreciated the Government's argument about the rule

12   of completeness. I'm going to have to take a look at that.

13       What do you anticipate, Mr. Jones?

14       **MR. JONES:** Well, it was the word "agent" that they

15   tossed in there that was causing me concern. We don't quite

16   understand who they are saying is an agent of Mr. Reifler for

17   purposes of statements against Mr. Reifler, and so we certainly

18   think that there -- it would be wholly unfair, you know, in a

19   situation where there's thousands and thousands of emails

20   talking about a subject matter to pluck out, you know, a couple

21   and then not allow them to be put in context with the witness

22   who is identifying them.

23       **THE COURT:** All right. Well, I think I may just --

24   I'll have to deal with that individually because sometimes

25   it -- well, as we just discussed with Mr. Schreiber, you know,

1  context matters sometimes.  So if that's what we're talking

2  about, you know, you'll be allowed to do it, but if -- we'll

3  have to see because apparently there are definitely some limits

4  on it.

5          **MR. JONES:**  There are.  We don't know who the

6  Government -- since there's no conspiracy count here --

7          **THE COURT:**  Well, your agent is, you know -- I mean,

8  it could be fairly simple.  It could be your assistant, right?

9          **MR. JONES:**  It could be in this case the reinsurance

10 company's CEO.  It could also potentially be the CEO of the

11 victim.

12         **THE COURT:**  Let's see.  Where is this in your -- oh,

13 there it is.

14         **MR. TYNAN:**  And, Your Honor, to potentially shortcut

15 this, we'd be glad to lay the foundation, obviously, for

16 whatever statement that we plan to introduce.  So it will be

17 clear at the time of the testimony whose statement it is that

18 we're trying to introduce; and to the extent the defense

19 objects to the foundation we've laid, then that's an objection

20 for the Court to decide.

21         **THE COURT:**  Okay.  Because it's not admissible as -- I

22 know the word "admission" is not there anymore, but it's still

23 good shorthand.  It wouldn't be an admission if they weren't

24 his agent, right?

25         **MR. TYNAN:**  Correct.

1    **THE COURT:**  Yeah.

2    And then -- I wasn't sure, Mr. Jones -- in your trial

3  brief, you talked about evidence that the owner of Port Royal

4  knowingly approved these investments.  And so does that mean he

5  was in on the fraud?  I mean, what are you saying about that?

6    **MR. JONES:**  I think that's a great question for the

7  jury, Your Honor.  I think it goes to whether or not my client

8  had specific intent to defraud, and I think it goes to whether

9  the Government carries their burden.

10    **THE COURT:**  I don't really understand because, I

11  mean --

12    **MR. JONES:**  So the -- briefly, if I could, I think I

13  can set it up.  Port Royal is the reinsurance company, and it

14  buys a portfolio of assets from another reinsurance called

15  Markel, M-a-r-k-e-l, and that money that's in then gets

16  invested.  It gets taken out of the trust account, and it goes

17  to different investments.  It goes to whether there was a fraud

18  at all by Mr. Reifler whether or not Port Royal knew that the

19  money was going out to those investments.

20    **THE COURT:**  Okay.

21    **MR. TYNAN:**  Yeah, the Government agrees that this is

22  going to be an issue at trial.

23    **THE COURT:**  All right.  Okay.

24    We talked about the experts.

25    It looks like I need to brush up on Rule 902(11).

1    **MR. TYNAN:**  Your Honor, if I could speak to that

2    briefly?

3            **THE COURT:**  Yes.

4            **MR. TYNAN:**  Just so the Court understands what the

5    Government plans to do and it's clear for everyone at trial, I

6    mean, there are financial records for which we've provided

7    902(11) notices.  The Government's position is that those are

8    generally not controversial documents to admit and plans to

9    admit them based on those 902(11) notices.

10       There is an entirely separate category of predominantly

11   emails, and the Government's proposed order of proof right now

12   is that there will be a witness on the stand who will be able

13   to identify the email address in the email, as well as

14   generally testify that they're familiar with the document.  And

15   the Government is prepared to offer those emails based on that

16   foundation, and that's how it's been proceeding.

17           **THE COURT:**  In bulk you mean?

18           **MR. TYNAN:**  Not in bulk, Your Honor.

19           **THE COURT:**  Okay.

20           **MR. TYNAN:**  There will be a witness on the stand to

21   talk about the email that the Government is offering to them.

22           **THE COURT:**  Okay.  All right.

23       Well, if the Defendant thinks it's -- if the Defendant is

24   going to object to these 902(11) exhibits, you know, please

25   tell the Government.

1      And, you know, if the Government would tell the Defendant
2  when you intend to offer them so that we can take it up outside
3  the jury's presence.
4          **MR. TYNAN:**  Your Honor, the Government believes we
5  could do this on the first day of trial before we even get to a
6  witness and just admit them.
7          **THE COURT:**  Okay.
8          **MR. TYNAN:**  That's what we were anticipating.
9          **THE COURT:**  Great.  Well, if there's -- maybe we'll
10  have to come in early on Tuesday morning if this still isn't
11  clear and do it at nine o'clock.
12          **MR. TYNAN:**  That's fine with the Government.
13          **THE COURT:**  Because, I mean, there's no reason to make
14  the jury wait on us.  So the Defendant is going to have to fish
15  or cut bait on their objections at some point.
16          **MR. JONES:**  That's fine.
17      And to be clear, our position was when the Government seeks
18  to offer its evidence is the time for the Defendant to object
19  to it.
20          **THE COURT:**  Okay.  Well, I'm not going to make the
21  jury sit here and listen -- you know, come in, they offer it,
22  and then I have to excuse them while we argue about it.  So if
23  you're going to object, you know, you're going to need to do it
24  so that I can handle that outside the presence of the jury.
25          **MR. JONES:**  Yes, Your Honor.

1      **THE COURT:**  And if the Government is going to do it

2  first and on Monday you're not willing to say, then we're going

3  to come in early on Tuesday and do it at nine o'clock.

4      **MR. JONES:**  Yes, Your Honor.

5      **THE COURT:**  Okay.  Because I'm not going to waste the

6  jury's time -- trial time doing that.

7      All right.  Everything else I think we just deal with as it

8  comes up in the trial.

9      Is there anything else y'all want to talk about that I have

10  not covered that would be helpful to you as you plan?

11      Mr. Jones, you look like you have something to say.

12      **MR. JONES:**  I believe it's probably a trial question.

13      **THE COURT:**  Okay.

14      **MR. TYNAN:**  That's it from the Government, Your Honor.

15  Thank you very much.

16      **THE COURT:**  All right.  I hope I've laid everything

17  out for you so everybody knows what to expect.  You know, we've

18  had -- I don't know how many trials I've had since the pandemic

19  started, but -- three or four -- and, you know, we've -- the

20  clerk has gotten pretty good at dealing with the jury and all

21  the logistics of it.  So I hope everything will run smoothly,

22  assuming nobody gets sick.  So there we are.

23      So I will need y'all to be here Monday, February 14th.  You

24  should be in the courthouse in your conference rooms by no

25  later than nine o'clock because we could need you in the

1  courtroom as early as 9:30.

2      And the clerk -- you know, check in with the clerk, confer

3  with her about those logistics and, you know, have your cell

4  phones and such -- some other way she can get in touch with you

5  other than running up the stairs, and we'll tell you when to

6  come in the courtroom.

7      And I will -- so the first time I see you will be in the

8  courtroom with the jury panel in here -- okay -- and then we'll

9  go from there.

10      All right.  Court is adjourned.

11  (Proceedings concluded at 4:19 p.m.)

12

13

14                    **C E R T I F I C A T E**

15      I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
16  CERTIFY:

17      That the foregoing is a true and correct transcript of the
   proceedings had in the within-entitled action; that I reported
18  the same in stenotype to the best of my ability and thereafter
   reduced same to typewriting through the use of Computer-Aided
19  Transcription.

20

21  _Lori Russell_

22  Lori Russell, RMR, CRR         Date:  4/5/22
   Official Court Reporter

23

24

25